Argued at Pendleton April 29; reversed June 10, 1941

IN RE LAMBERT'S ESTATE

GOURLEY ET AL. *v.* TATE ET AL.

(114 P. (2d) 125)

Before KELLY, Chief Justice, and BELT, BAILEY and LUSK, Associate Justices.

*W. C. Winslow*, of Salem (R. C. Glover, of Salem, on the brief), for appellants.

*E. M. Page*, of Salem (Keyes & Page, of Salem, Bernard H. Ramsey, of Portland, and W. B. Yates, of Madras, on the brief), for respondents.

KELLY, C. J.   About 1895, the late Mr. Nicholas J. Lambert came from the Willamette valley where other members of the Lambert family were living, and took up his abode in a section of what was then Crook county, which later became the Grandview District of Jefferson county. He first engaged in raising and selling horses. After a comparatively few years, he disposed of his horses and engaged almost exclusively in raising and selling cattle. The record discloses that for many years he personally rode the range tending his herds. Throughout his life, he remained unmarried. He accumulated considerable property consisting in part of cattle ranches. Upon these ranches he erected cabins making it a practice during his active life to live upon the particular ranch where his cattle were at that time.

He acquired a ranch, near Grandview Post-office, known as the Allingham ranch which was suitable for raising grain.

In 1919, the proponent, Frank N. Tate, leased this ranch and operated it as a renter up to the time of Mr. Lambert's death. For about two years immediately after Mr. Frank N. Tate took possession of the Allingham ranch, Mr. Lambert, the decedent, lived there. Mr. Lambert then went to a ranch known as the Kessner place about five miles southeast of the Allingham ranch. As stated, he also moved from one ranch to another dependent upon the whereabouts of his cattle. He retained a room at the home of Mr. Frank N. Tate and would return there from time to time treating that household as his headquarters during the period of his activity as a herdsman, except for about a year and a half in 1928 and 1929 during which time he lived with Mr. Monical, who was a joint owner with him of a herd of cattle.

In October, 1935, Mr. Lambert disposed of his cattle interests and moved into the Frank N. Tate household living there until he went to Mt. Vernon Hot Springs. He made seven trips to and from those springs during the summer and fall of 1936. In November of 1936, he moved to the springs where he remained until June of 1939, when he was removed by Mr. Frank N. Tate to a hospital in Prineville, Oregon, where he remained until he passed away.

Mr. Frank N. Tate testified that Mr. Lambert was born on March 3, 1857. The purported will was signed on April 3, 1937; and Mr. Lambert died on August 7, 1939.

Contestants deny that, when he signed the document in question, the decedent, Mr. Lambert, had testamen-

tary capacity; and allege that at that time he acted under the undue influence of proponent, Mr. Frank N. Tate.

As we view the record, the decisive question is whether proponents have proved that decedent had testamentary capacity when he signed the purported will.

Mr. Ramsey, Mrs. Tate, the son and daughter of Mr. Tate, and Mr. Frank N. Tate's mother testify in effect that the decedent was then possessed of the requisite mental capacity.

Mr. Richard Tate, a brother of proponent Frank N. Tate, testified that he last saw defendant about September 20, 1938, and that decedent was then apparently normal.

Two physicians testified, Dr. J. H. Rosenberg, who had known decedent many years, and Dr. R. H. Jenkins, who, with his wife, conducted the health resort at Mt. Vernon Hot Springs, and was an attesting witness to the purported will.

The crux of Dr. Rosenberg's testimony, as to Mr. Lambert's testamentary capacity, is reflected in the following questions and answers:

"Q. I will ask you if, in your opinion, during the time he was there," [at the hospital in Prineville] "particularly the early part before his death, if, in your opinion, he knew what property he was possessed of?

A. Well, I think he did.

Q. And I will ask you if, in your opinion, if he was making a will if you would say that he would know whom he would want to give this property to?

A. I believe he would if he was told what he was intending to do that he probably would be able to know exactly what he was doing.

Q. You mean if he was told that he was making a will?

A. Yes, if he was told he was making a will."

As we understand the meaning of Dr. Jenkins' testimony in its entirety, it is to the effect that when the purported will was signed Mr. Lambert did not possess testamentary capacity.

During the oral argument, counsel for proponents urged that Dr. Jenkins testified, in effect, that, at the time of the execution of the purported will, Mr. Lambert possessed testamentary capacity and based this assertion upon the following portion of Dr. Jenkins' testimony. In his direct testimony, as a witness for proponents, he testified as follows:

"Q. What was his condition at the time the will was executed?
A. Well, it was fairly good; he was always up and round; physically he was stout as a young man.
Q. And you would say at that time he would understand fully the property he owned?
A. Well, I suppose—I guess he did.
Q. At that time when you saw him would his mentality be such that he would know to whom he would want to give his property, speaking now particularly of the time of making the will, Doctor?
A. I guess he would—well, I have an idea he knew what he was doing."

On redirect examination, while testifying as a witness for proponents, he also answered the following questions as follows:

"Q. You don't intend to change your testimony in chief wherein you said it was your opinion that at the time he made this will he knew what property he possessed and that, in your opinion, he had mentalith [sic] enough to know whom he would wish to give it to in a will?
A. I think I testified that you name over the property to him he would know that he had it.
Q. And to whom he wanted to give it?
A. Yes."

Among other things, Dr. Jenkins testified that Mr. Lambert took external medicine internally; paid money when none was due; forgot all about mailing a $51.00 check; wanted to settle with Dr. Jenkins every day, although Mr. Lambert was there on a monthly basis; that Mr. Lambert didn't know where he was; that he would start off for Culver, which he said was right over the hill, when in fact it was two hundred miles away. That Mr. Lambert claimed Dr. Jenkins' place as his own; that he claimed to own the stock on it, though it belonged to Dr. Jenkins; that Mr. Lambert would leave without giving any notice of his intention to do so, and would "get into a wrangle" with the doctor's granddaughter about riding a horse belonging to the doctor insisting that he, Mr. Lambert, the decedent, owned it. When he accompanied workmen to the woods belonging to the doctor, much of the time the decedent would claim that the outfit belonged to him; and at times, when he was not suited with the work, the decedent would tell the men that he "was going to fire the whole bunch and get some new men."

Within five minutes after the purported will was executed, the doctor said to the decedent, "well, you made a will did you dad?" The answer was: "No, I sold a piece of land."

In connection with that episode, the doctor was asked:

"Q. Was he joking about it or was he as serious as he usually was?
A. As serious as he ever was."

Dr. Jenkins testified that he borrowed $1,250 from Mr. Lambert and gave him a note for it secured by a mortgage on 480 acres of land for which the doctor had paid $2,500. Afterwards, Mr. Tate came to Dr. Jenkins

and told him that Mr. Lambert didn't know where the mortgage was. Thereupon, they opened Mr. Lambert's suit case and found the note and mortgage.

It appears from Dr. Jenkins' testimony that a Mr. Bodifelt told Mr. Lambert that he ought to will Mrs. Jenkins two or three thousand dollars, and he said he would. Upon being asked why that wasn't done, Dr. Jenkins answered:

* * * "I knew if a will like that was made it would be contested, and didn't want to be scrapping a will that was made on a man as weak mentally as he was."

Dr. Jenkins also testified that at the time the purported will was signed, if one mentioned anything in the past to Mr. Lambert he was all right. The doctor was then asked whether Mr. Lambert could carry on a conversation with reference to something that happened in the last day or so and he answered: "Yes, he could talk, he could carry on a conversation with you, but he couldn't remember it."

We quote again from the doctor's testimony:
"Q. Did he know people, did he have friends call on him there at times at the springs?
A. Yes, but he didn't know anybody.
Q. Who would call, name some that came up there?
A. It didn't matter who would come there, if I knew or whether I didn't know them, I would say who is that, Mr. Lambert, and he would always say it is Asy New; he would not know the other one if there was two of them."

Dr. Jenkins also testified that Mr. Lambert would get away from them, and on one occasion, during the swimming season of 1937, he got out in the hills. The doctor said that he had men out hunting for him until darkness caused them to stop; that about 3 o'clock in the morning Mr. Lambert came into a camp up the

creek and the doctor went up and got him. The doctor testified that Mr. Lambert's clothes were torn off and he was skinned up and bruised. Dr. Jenkins also testified that Mr. Lambert lost control of his bladder and was indiscreet about when he would urinate; that for such purpose, he usually used the bed or just wherever he happened to be at the time without any reference to the presence of others.

We also quote the concluding questions and answers of Dr. Jenkins' cross-examination as a witness for proponents:

"Q. Referring to that time in April, of 1937, at the time of the execution of the will, how would you say his mental capacity would measure up with the ordinary person?

A. Well, it was very poor.

Q. If you were raing [sic] him where would you rate him as a child or as a man.

A. A child.

Q. What age?

A. Oh, some children are brighter than others, you know.

Q. Well, as an average?

A. Four or five years old."

The record discloses that during the direct examination of Dr. Jenkins, while testifying as a witness called by proponents, his affidavit as an attesting witness to the execution of the purported will was offered in evidence and received by the trial court as part of the record of the ex parte probate proceedings. The trial court expressly stated at that time that such affidavit was not to be taken as a statement in the consideration of the testimony in the trial of the contest of the validity of the will. The affidavit is known to the record as proponents' exhibit 2.

After the conclusion of contestant's testimony, proponents again offered proponents' exhibit 2. The court then received it in evidence without qualification or restriction.

This affidavit contains the statement that "at the time of executing the said instrument, the said N. J. Lambert deceased * * * was of sound and disposing mind, and not under any restraint, undue influence or fraudulent misrepresentations."

We quote Dr. Jenkins' testimony as to the circumstances of his signing it:

"Q. Do you remember the circumstances of signing this affidavit?
A. Yes, I remember.
Q. Did you read it before you signed it?
A. No, sir.
Q. What was told you as to what its contents were before you signed it?
A. Well, Mr. Ramsey called me in, and he said: You and your wife witnessed Mr. Lambert's will, did you? And I told him yes. He said: Before I can probate the will we have got to have the affidavit that you are witnesses to that will. He brought this over and he handed it to me and I signed it.
Q. Did he tell you there was anything in this affidavit regarding the question of Lambert's mental capacity at the time of the execution of the will?
A. No, sir.
Q. Did he tell you there was a provision in here regarding the question of undue influence at the time?
A. No, sir, there was nothing said about it, only we give an affidavit that we were the ones that witnessed the will."

Mr. Ramsey testified that Dr. Jenkins looked at the affidavit thus having an opportunity to read it before affixing his signature thereto; but Mr. Ramsey did not

testify that he stated to Dr. Jenkins that the affidavit contained a statement concerning Mr. Lambert's mental capacity or the absence of restraint, undue influence or fraudulent representations.

The statute provides "that in case of contest of said will or the probate thereof in solemn form, the proof of any or all material or relevant facts shall not be made by affidavit, but in the same manner as such various questions of fact are now proved in a suit in equity." Sec. 19-204, Vol. 2, O. C. L. A., p. 547, 548; Sec. 11-203, Oregon Code 1930; Laws, 1921, ch. 97, p. 145.

■ At most, the affidavit could be considered herein only upon the question of the credibility of Dr. Jenkins' testimony not as substantive proof of its contents. For these reasons, this affidavit does not in any wise strengthen proponents' affirmative showing upon the question of the testamentary capacity of the decedent Mr. Lambert.

"The courts generally receive with great caution and scrupulous jealousy the testimony of a subscribing witness to a will which tends to discredit the testamentary capacity of the testator." Case note to Re Estate of Edward Shapter, Deceased, (35 Colo. 578, 85 P. 688) 6 L. R. A. (N. S.) 575, and cases there cited.

"This is on the ground that such witnesses, by their attestation, authenticate the instrument as good, and vouch for the testator's capacity; and, if they afterwards attempt to impeach the will, their evidence is of little, if any value." Ibid, p. 576, and cases there cited.

■ Despite the foregoing principle of law, we think that the mere attestation of the execution of a will affords only a presumption that the attesting witnesses will support its validity, if called as witnesses in a contest of such will, by testifying that at the time of its

execution the testator was of sound and disposing mind; but, when such attesting witnesses testify to the contrary, such presumption is overcome.

■ In the case at bar, we think that Dr. and Mrs. Jenkins cannot be charged with venality or intentional failure to perform the duty enjoined by law upon those who are called upon to become subscribing witnesses to the execution of a will, namely, that of declining so to act, if in their opinion the one seeking to execute the will is not possessed of testamentary capacity.

The writer agrees with a statement made many years ago by Mr. Justice Sargent in delivering a majority opinion of the Supreme Judicial Court of New Hampshire, while discussing the rule of evidence permitting attesting witnesses, though not experts, to express their opinion in regard to the sanity of a testator.

We quote:

"The exception that subscribing witnesses to a will, though not experts, may give their opinion in regard to the sanity of the testator, is placed by many upon the ground that the testator has selected and chosen these witnesses as being those best qualified to state in regard to all points necessary to be proved, in order to establish the will. But we are inclined to give but little weight to this consideration since all who are familiar with the practice in such cases know that ordinarily the testator has nothing to do with selecting the witnesses to his testament. The scrivener usually calls on those who are nearest at hand, and who can most conveniently be had to attest the execution of the instrument he has drawn." *Boardman v. Woodman*, 47 N. H. 120, 134.

The convenience of the scrivener and the principal beneficiary seems to the writer to have had more to do with the selection of Dr. and Mrs. Jenkins as attesting witnesses in the instant case than the choice of Mr.

Lambert, although the record discloses that Mr. Lambert assented to such selection. More than that, except members of the legal profession, very few people are aware of the principle of law which declares that the attestation of a will by a subscribing witness entails a certification that the testator is possessed of testamentary capacity; and, if any one, holding the view in a given instance that the proposed testator is of doubtful testamentary capacity, should.be requested to sign such testator's will, as a subscribing witness, such person should decline to sign it.

Most of the laity think that such attestation simply implies that the subscribing witness saw the testator sign the document. In saying this, the writer disclaims any thought of changing the rule mentioned; but deems a mistake made by those unfamiliar with the rule far less reprehensible than many of the authorities on the subject seem to imply.

At the conclusion of the contestants' testimony, their attorney asked the court to give contestants an opportunity to take the deposition of Mrs. Jenkins whose illness prevented her attendance upon the court in answer to a subpoena served upon her at the instance of the proponents.

The court suggested that counsel for contestants make a statement of the testimony Mrs. Jenkins would give in order to ascertain whether proponents would admit that, if present, she would so testify.

We quote the statement contestants' attorney so made:

"Mr. Winslow: In accordance with your Honor's suggestion, the principal thing that we want to prove by Mrs. Jenkins is that she was very closely associated with him, rendered most of the personal car (sic) that was rendered him, and that in her opinion, on the 3rd

day of April, 1937, Mr. Lambert wasn't competent to know the property that he had, what relatives he had or to give any reason whatsoever for any disposition of any property that he might make by will, or otherwise. We want her to testify to her reasons for reaching that conclusion, which would be mostly in corroboration of most of the things related here by the other witnesses from the Jenkins' household, together with many others, which I can't give now, except several discussions regarding Nick's desire to make a will to her, between herself and Nick; and she refused to accept it because she didn't think he had the mentality to execute it.

The Court: Will that be her testimony if she came?

Mr. Winslow: Generally. I have been through this now with several of these witnesses so that I would not be able to give all the details—just the difference—just the different incidents she could refer to. I know she can describe most of those that have been in here. For instance, what happened on the hill, she wasn't present, she wasn't out in all those trips after him, but on the other hand, she knows a great many more details about his peculiarities about the house than any of the other witnesses.''

After some discussion between court and counsel, Mr. Ramsey, attorney for proponents, said:

''Mr. Ramsey: If the court will grant us a moment here at the counsel table. (Counsel confer) I think we would be willing to stipulate that the witness, if called, would testify substantially as counsel as [sic] stated, except that we would not want to stipulate that she would testify as to her conclusion that he was not possessed of testamentary capacity on the 3rd day of April, 1937.''

The court then said in effect that it would be advantageous to the court, and to the parties to close the case on those admissions.

We quote further from the record on this phase of the case:

"Mr. Winslow: If that is the best we can get we are going to accept what we can get.

The Court: They will accept the testimony she would give as you state in your offer, and you will waive the opinion, the final opinion of the witness on that question.

Mr. Winslow: If there is a necessity we would. We would not want to do that, but if that is what you think we ought to do — — — —

The Court: I think we will do it that way. I think it will satisfy the court to close the case that way as far as the proponents of the will are concerned.

Mr. Winslow: With that we rest, your Honor."

Unquestionably, the same principle of law applied to the testimony of Mrs. Jenkins covered by this stipulation as to the testimony of her husband because she was an attesting witness to the will in suit; but we are unable to reach any other conclusion than that the proponents did not and could not adduce testimony from either of the attesting witnesses to the effect that at the time of signing the document in suit the decedent Mr. Lambert was possessed of testamentary capacity. On the contrary, their testimony is to the effect that decedent was not possessed of sufficient mentality to enable him to execute a valid will.

Disregarding the attitude of Dr. and Mrs. Jenkins on the question of Mr. Lambert's testamentary capacity, further than to consider it as not supporting the position of the proponents; in other words, as having a negative effect only, we are of the opinion that the testimony does not preponderate in favor of the contention that, when the document in question was signed by Mr. Lambert, he was possessed of testamentary capacity.

First, we will summarize the testimony presented by proponents in that regard: Mrs. Isabel Poindexter, who was in charge of the hospital at Prineville to which Mr. Lambert was taken on June 28, 1939, which it will be noted was more than two years and two months after the execution of the purported will, testified that when Mr. Lambert first came to her institution, he would have mentality enough to know to whom he would want to give his property, but during the last part of his stay he would not. Mr. Lambert was in Mrs. Poindexter's hospital from June 28 to August 7, 1939. Mrs. Poindexter also testified that when Mr. Lambert entered her hospital he correctly gave her the date and place of his birth. She was asked if Mr. Lambert gave her information in regard to his next of kin to which she replied in the negative.

On cross-examination Mrs. Poindexter testified that while Mr. Lambert was in her hospital they watched him to see whether he would go away.

We quote from her cross-examination:

"Q. But you said you did watch him?
A. Well, we do.
Q. Why did you do that?
A. To keep him out of trouble, or any place they might go.
Q. As a matter of fact, they are like little children, aren't they?
A. Yes, we all are, old people.
Q. In that age, in that condition, like a little child, have to be watched, taken care of like a little child?
A. Just about the same."

Mr. Lewis H. Irving testified that, as an attorney, he transacted business for Mr. Lambert beginning sometime about 1915 and periodically from that time until 1935; that on one occasion in the spring of 1935,

Mr. Lambert consulted Mr. Irving about making a will; and at that time told Mr. Irving that he wanted everything that he had to go to Frank [referring to Mr. Frank N. Tate]. In that conversation, Mr. Lambert said that Mr. Frank N. Tate was the only one of his relatives that had ever done anything for him.

Mr. Irving further testified, in effect, that in November, 1936, or thereabouts, Mr. Lambert was possessed of testamentary capacity.

Mr. McCaffery testified, in effect, that in November, 1936, Mr. Lambert had normal mental capacity and was qualified to execute a will.

Mr. Mayfield, a former business associate of Mr. Lambert, testified that in the summer of 1936, during the haying season Mr. Lambert visited at Mr. Mayfield's ranch and that at that time Mr. Lambert was normal mentally.

Mr. Richard Tate, a brother of Frank N. Tate, testified that along about September 20, 1938, he last saw Mr. Lambert. They were there at Mt. Vernon and Mr. Lambert appeared to be "just about the same as he always was." In effect, Mr. Richard Tate testified that at that time, namely, in September, 1938, Mr. Lambert was possessed of testamentary capacity.

Mrs. Evelyn Campbell, a daughter of Mr. Frank N. Tate, testified that in company with her father, she made a trip to Mt. Vernon Hot Springs to see Mr. Lambert in March, 1937, and following that until November, 1938, she and her father made trips up there every month or so to see him. Her last visit with Mr. Lambert was in company with the gentleman who later became her husband. That occurred upon the Sunday after Thanksgiving in 1938. Mrs. Campbell testified that she had had much experience in practical nursing

and for about six months had taken care of one lady over eighty years of age.

We quote from Mrs. Campbell's testimony:

"Q. (By Mr. Page) From your acquaintanceship and your knowledge of Mr. Lambert, what would you say as to whether or not he had sufficient mentality to comprehend the nature and extent of the property that he owned?
A. Yes, I think he did.
Q. Would you say that he did or did not have sufficient mentality to know to whom he desired to leave that property in the event that he desired to leave it to any one.
A. Yes, I think he did."

\* \* \* \* \*

"Q. Was there any material change in his mental condition the last time that you saw him in November of 1938 and take, for instance, at the time that you first came on his place in September of 1919, if you can recall that?
A. I don't think there was any difference in his mental —in his mind at all, he was like most people, he forgot easily."

Mr. Bernard H. Ramsey testified, in effect, that he had known Mr. Lambert for twenty or twenty-five years before his death; and had known him intimately from 1932 or 1933 until Mr. Lambert passed away; that he, Mr. Ramsey, had handled considerable legal business for Mr. Lambert during the three years preceding Mr. Lambert's death; that Mr. Tate insisted upon being put under bond as a condition precedent to taking further care of Mr. Lambert's business and hence the guardianship proceedings were instituted. Mr. Ramsey construes the petition for the appointment of a guardian for Mr. Lambert as being based upon the ground of physical inability. Considering, in its entirety, the

petition signed by Mr. Lambert, we are unable to put that construction upon it. Omitting the title and prayer thereof and the signature thereto the petition is as follows:

"Comes now N. J. Lambert and respectfully shows the Court that he is a resident and inhabitant of the County of Jefferson and State of Oregon and of the age of eighty-one years; that your petitioner owns considerable property, largely in the County of Jefferson and State of Oregon, and that in the administration of said property and the business connected therewith that it is imperative that some person of good mental and physical health have charge of same; that your petitioner, as above stated, is of the age of eighty-one years and is physically in failing health and believes, and therefore states, that he is no longer capable of handling his personal affairs in the conduct of his business to his own best interest, and further believes, and therefore states, that his present condition is such that it is advisable that a guardian of his person and estate be appointed by this court."

We construe the foregoing petition to reflect natural mental, as well as physical, impairment attendant upon advanced age as a basis for the requested appointment of "some person of good mental and physical health", "as the guardian of the person and estate" of the petitioner.

It is apparent that Mr. Ramsey was acting as attorney for Mr. Frank N. Tate in the guardianship matter when he prepared the will in suit. Mr. Ramsey testified that Mr. Tate, the guardian, told him that when he went to Mt. Vernon to complete the transfer of some land by Mr. Lambert to the government, Mr. Lambert desired him to come prepared to finish drawing his [Mr. Lambert's] will. It is also true that Mr. Tate, the guardian, is the principal beneficiary under

the terms of the will in suit. Likewise, the record discloses that the will was prepared in an automobile with no one present but the attorney for the guardian, part of the time the guardian, and the decedent.

■ We cannot approve the course taken, by having a notary certify to the acknowledgment by Mr. Lambert that he executed said deed when in truth and in fact Mr. Lambert did not appear before such notary, did not acknowledge the execution of said instrument before such notary, and when the certificate of acknowledgment was signed Mr. Lambert was at Mt. Vernon, while the notary was in Mr. Irving's office in Madras. This matter is collateral to the issues herein but it emphasizes the duty of the court to scrutinize carefully to circumstances of the purported execution of a last will and testament by one who has submitted to guardianship of person and estate, where such will is prepared by the attorney for the guardian, and by its terms makes such guardian the principal beneficiary of the will.

Mr. E. A. Montgomery also testified that in 1934, he had a conversation with Mr. Lambert. We quote from the record:

"Q. Tell the court what that conversation was, as near as you remember it?

A. I don't know how many nights he had been—he come in there one night away after dark, and he had lost his hat. and he come down off the mountain brush with his hat gone; and I got the supper; he went in the other room, perhaps half past eight or nine o'clock then. I jumped on him, you might say, about getting old, had plenty to keep him, running around the country the way he did, and he just grinned around. I just finally asked him—what are you going to do with your money, you can't take it with you, or anything; he just made

the remark after a little while he was going to give it to Frank, and Ann.

Q. Do you know whom he meant?
A. He meant Frank and Ann Tate.
Q. That is Frank Tate's deceased wife?
A. Yes.''

Upon cross-examination, it was developed that Mr. Montgomery was indebted to the Lambert estate in the sum of $1,800 upon a loan negotiated with Mr. Tate.

Mr. E. B. Graham, a friend of Mr. Lambert for many years, testified that he saw Mr. Lambert for the last time in the fall of 1936, and in his opinion, Mr. Lambert then had sufficient mental capacity to execute a last will and testament.

Mr. Francis Tate testified that he is a son of Mr. Frank N. Tate; that after an absence from home since 1932, he returned in the spring of 1938 and went to the Mt. Vernon Springs where he saw Mr. Lambert; that thereafter, he saw Mr. Lambert five or six times at the springs before the death of Mr. Lambert and for a man of his age Mr. Lambert was above average.

Mr. Robert New, while in Oregon, became acquainted with Mr. Lambert in 1913, then left for Idaho to return for two weeks in 1925, and again in 1926, 1927 and 1930. During the winter of 1930, Mr. Lambert and Mr. Robert New lived in the same house. After going from Oregon to Idaho and back again several times, Mr. New paid a visit to Mt. Vernon Hot Springs in reference to the satisfaction of a mortgage which Mr. Lambert signed. That occurred on the 27th day of June, 1937, according to Mr. New. Mr. Frank N. Tate accompanied Mr. New and told Mr. Lambert the object of the visit. Mr. New testified that he could see no difference then in Mr. Lambert from his condition formerly except that he was older.

We now summarize the testimony presented by contestants in regard to testamentary capacity:

Mr. Tom Hawkins, as a witness in behalf of contestants, testified that he was at Mt. Vernon Hot Springs during the winter of 1936 and the spring of 1937; that Mr. Lambert claimed to have bought a ranch in that vicinity and was going to put some men to work over there; that Mr. Lambert chided the workmen in the employ of Dr. Jenkins for not working fast enough.

We quote:

"Q. What did he say?
A. He said, you damn fellows fooling around here, I am going to get me another crew of men.
Q. Do you know of any instance there where there was any trouble to keep track of him?
A. Oh, yes.
Q. What was the difficulty over that?
A. Well, he had a notion to get out in the hills all the time. I can name you one particular one that I know about because I tracked him up part way and then I went back and got a horse. There is a little ranch over about a mile and a half that he always went in that direction, which is northwest from there, so I tracked Nick for a ways around there and I couldn't find him and I went back and got a horse and found him up there; and I asked him where he had been? He said he started over to Culver.
Q. How many miles would it be through there to Culver.
A. I guess probably the court knows he was going in the wrong direction."

\* \* \* \* \*

"Q. Did you ever hear of him refer to the stock around there as his stock, cattle?
A. Yes.

Q. What did he say about that?

A. He thought they were not doing too well and spoke something about it."

\* \* \* \* \*

"Q. From what you say of him there, I would like to ask you whether or not, in your opinion, thirty days, or a little over thirty days after you left there in March of 1937, particularly on April 3rd 1937, he had the mental capacity to go through a business transaction and understand it?

A. I would say not.

Q. Do you think he had mental capacity to comprehend what property he had?

A. I don't think so.

Q. Do you think he had mental capacity to comprehend what relatives he had?

A. I don't think so. So far as his relatives are concerned, I never heard him mention any of them.

Q. Do you think he had mental capacity to figure out a rational reason why he should dispose of any of his property to any one of his relatives?

A. No, sir."

Mr. Walter Jenkins, a son of Dr. Jenkins, testified to Mr. Lambert claiming to own Dr. Jenkins' stock and objecting to Dr. Jenkins' niece riding a horse belonging to the doctor; to Lambert's objecting to the manner the men were working on the doctor's ranch; to his running off, and on one occasion remaining out all night; to his standing on a road waiting for the public stage when in fact that road never had been used by the stage, to his inability to find his bed; to his going to bed with his day clothes on, and expressed an opinion that Mr. Lambert did not have mental capacity to understand what property he owned.

Mrs. A. C. New testified that she had known Mr. Lambert for thirty-five years; that she called upon Mr. Lambert in April, 1937, and he did not recognize

her; that after she gave him her name he seemed to know her for a few minutes and then lapsed into silence; that in 1937 or 1939 Mrs. New heard Mr. Lambert tell Mr. New that he, Lambert, had sold his Metolius ranch to Ike New, which was not a fact.

We quote from Mrs. New's direct examination:

"Q. Did the Nick Lambert that you saw there in April of 1937 have the same mentality of the Nick Lambert that you had known formerly over here?

A. No sir.

Q. I will ask you whether, in your opinion, at that time, the man had mental capacity to know what property he had, or his relatives?

A. No, I don't consider he knew what he was doing."

     \*       \*       \*       \*       \*

Mr. A. C. New corroborated Mrs. New's testimony.

Mr. Wilson Jenkins, a son of Dr. Jenkins, shaved Mr. Lambert regularly while he was at the springs and in a general way corroborated the testimony of his brother Walter Jenkins. In reference to the necessity of helping Mr. Lambert to bed, Wilson Jenkins testified that not always would be remain in bed after he had been placed there. We quote from the record:

"Q. Did you have occasion to observe whether or not he always stayed in bed after you put him there?

A. No, sir, he didn't: when we got up in the morning he would be out in the kitchen laying on a blanket, or something; he would move his bed out there. I would give him my bed room when he come so he would not have to go upstairs, and I moved upstairs. I would come down to build fires, he would be laying out there in the middle of the floor with a quilt, and he would bring his bed out there. Sometimes he would have the mattress and everything off the bed.

Q. Ever find him any other place with his bed?

A. No, sir.

Q. How soon after that took place there did you folks have to help him with his dressing and undressing?

A. Practically all the time we helped him.

Q. Did you have occasion to hear him talk about the ranch on the hill over there that the boys referred to as to whether or not—who he thought that belonged to?

A. Well, it is my estimation that he talked about ranches on every hill around there.

Q. Did he refer to any of them as his ranches?

A. It was all his ranches, everything that was there was his.

Q. About the stock did he make any claim to that?

A. He did.

Q. How about keeping him at home there, was he in trouble about that, keeping him there at the springs?

A. We had to keep him there all the time. The only way we could keep him was to hand him a magazine, or something; he would look at it two or three hours at a time and throw it down.

Q. Did you ever see him reading a paper with it upside down?

A. Yes, sir.

Q. As early as April, 1937?

A. Yes, sir.

Q. Did he actually get away from you notwithstanding you watching him there sometime?

A. Yes, he got away from us several times.

Q. Did you help find him?

A. The whole community helped hunt for him lots of times.

Q. Were you ever one that found him on any of these occasions?

A. Yes.

Q. Now, based upon what you had occasion to observe there, I will ask you whether or not, in your opinion,

in April of 1937, he had mental capacity sufficient to know what property he owned?

A. No.

Q. Or who his relatives were?

A. No.

Q. Or to give a rational reason for disposing of his property to anyone?

A. No."

\*　　　\*　　　\*　　　\*　　　\*

"Q. Who did the milking?

A. I did part of the time.

Q. Did he ever help you milk?

A. He never did; he tried several times and we would have to stop him; about noon he would grab a bucket, any time of day if it struck him right; head up that way, turning the calves out with the cows.

Q. Did he ever try to help you pack wood in the house?

A. He did two or three different occasions that I know of; and we had to stop him; he took it down to the hog pen and once to the swimming pool."

Taking into consideration that in order to sustain the validity of the purported will, proponents must prove testamentary capacity on Mr. Lambert's part by a preponderance of testimony, and that they must overcome the presumption arising from the pendency of guardianship that Mr. Lambert lacked testamentary capacity; and also bearing in mind that proponents are unable to present the testimony of the subscribing witnesses to the effect that Mr. Lambert was endowed with testamentary capacity and that Dr. Rosenberg qualified his opinion of Mr. Lambert's ability to realize what property he owned to those occasions when he had been informed that he was making a will; and recognizing that apparently disinterested witnesses have testified that Mr. Lambert was without testamentary capacity, we think pro-

ponents have not proven facts justifying an order probating the will.

■ Referring to the incident mentioned by Mr. Robert New when Mr. Lambert signed a satisfaction of mortgage in June of 1937, proponents say:

"That N. J. Lambert did understand the business that he was transacting that day is further substantiated by Contestants' Exhibit 'K' the Satisfaction of Mortgage, referred to by Mr. New. This satisfaction was acknowledged before Orval D. Yokom, an attorney of this court, who according to the record had taken Mr. Lambert's acknowledgment upon other documents before this time. Surely we can assume that if N. J. Lambert was the senile idiot which Contestants witnesses attempt to picture him, Mr. Yokom would not have permitted the execution of this document."

Mr. New testified that only Mr. Tate and he went to the springs that day, in June of 1937, to secure the signature of Mr. Lambert to the satisfaction of mortgage. He made no mention whatever of Mr. Yokom.

We quote from Mr. Tate's testimony:

"Q. * * * * Now, referring to this trip that you and Bob New made over to see Nick in June of 1937, is that when it was?

A. In June, 1937.

Q. As far as that mortgage is concerned, you satisfied it as guardian on the margin?

A. I am not sure whether I satisfied it on the margin I know I satisfied it some way.

Q. As guardian?

A. As guardian. I may have signed,—filed the satisfaction.

Q. But getting this satisfaction over there was just a formal matter that Bob New wanted something signed by Nick?

A. That was the idea exactly.

Q. Who prepared that satisfaction?

A. I had one at home.

Q. You fixed it up yourself?
A. I think I did.
Q. Took it over; was there any acknowledgment?
A. There was no acknowledgment on it. Nick signed it and I witnessed it to show Bob had something that Nick said it was paid.
Q. It was never recorded or notaried?
A. No sir.
Q. You remember that pretty well?
A. Yes.''

Applying the argument made in the above quotation from proponents' brief, it could be argued that Mr. Tate and Mr. Ramsey thought that, because of Mr. Lambert's mental capacity, a notary if present in person would not certify to an acknowledgment by him; and, for that reason, on the 3rd day of April, 1937, no notary was procured to attend at the signing by Mr. Lambert, on that day, of a deed conveying land to the government; but about a week later an absent notary made a false certificate of acknowledgment on that deed.

Moreover, Mr. Yokom's absence when the satisfaction of the New mortgage was signed by Mr. Lambert in June, 1937, although later a certificate of acknowledgment thereof was signed by Mr. Yokom, may plausibly be urged to have occurred because for the reason stated, a notary, if personally present, would not have been willing to take Mr. Lambert's acknowledgment.

Upon the oral argument, counsel for proponents urged that the case of *Pickett's Will,* 49 Or. 127, 89 P. 377, is decisive of the case at bar and upholds proponents' position. We think that there is a marked distinction between the Pickett Will case, supra, and the instant case. In the former, the three attesting

witnesses testified that they observed nothing in Pickett's action at that time to indicate that he was not competent to execute will. In the instant case, as stated, the attesting witnesses did not so testify. In the Pickett case, the testator was not under guardianship, the principal beneficiary was his sister living at a distance and sustaining no fiduciary relationship to the testator; while, in the case at bar, the principal beneficiary was the decedent's guardian and for years had sustained a close fiduciary relationship to decedent.

The decree of the circuit court, admitting the purported will in suit to probate and dismissing contestants' petition herein, is reversed; and it is ordered that the probate of said purported will be and the same is hereby revoked, canceled and held for naught.

BELT, J., did not participate in this opinion.