Argued January 15; affirmed April 30, 1946

IN RE SOUTHMAN'S ESTATE

LUMEON *v.* RICE ET AL.

(168 P. (2d) 572)

*Mark V. Weatherford,* of Albany (Weatherford & Thompson, of Albany, on the brief), for appellant.

*Bruce Spaulding,* of Salem (L. Leonard Krause, of Toledo, and Bruce Spaulding, of Salem, on the brief), for respondents.

BRAND, J.

In this contest Ann Lumeon, sister and sole heir at law, seeks to invalidate the will of Adolph Southman upon the ground of testamentary incapacity and of undue influence alleged to have been exerted by Adeline Rice, the principal beneficiary under the will. The cause was transferred to the circuit court for trial. From a decree dismissing the contest, affirming the

order of the probate court and admitting the will to probate, the contestant, Ann Lumeon, appeals.

Adolph Southman died in the County of Lincoln on the 3rd of September, 1940, at the age of 66 years. He left a will dated the 8th day of July, 1940, which was duly executed in the presence of Abe Abrams, Jr., and Mrs. Marion B. Slade, the attesting witnesses. Adeline Rice was named therein as the executrix without bond. The beneficiaries named in the will were Margaret Loraine Rice, then aged 13 years who received a bequest of one thousand dollars, and Adeline Rice, her mother, then aged 37 years who received the residuum. Adeline Rice was appointed executrix and qualified as such. In this suit she appears personally, as executrix and as the guardian ad litem for her daughter.

Southman was born in Esthonia in 1874. He came to the United States in 1900 and was employed for many years in the lightship service at Astoria. The evidence is undisputed that prior to November 1937 he was a hardy man of sound mind and good judgment. In November 1937, during a storm and while employed on the lightship, he fell and sustained a severe injury. At that time he had a cerebral hemorrhage which was apparently either the cause or the effect of the fall. He was in a state of coma for two days and was then in the hospital at Astoria for ten or eleven days at which place an operation for hernia was performed. He was then taken to the home of his then friend, Thomas Wahters, in Portland for a few days, after which he was taken to the Marine Hospital in Seattle, where he remained until January 1938.

Mrs. Rice, the principal beneficiary under the will, and Southman had been close friends since 1936. Southman was discharged from the hospital on January 3, 1938, and he then returned to the John Allick place

near Rose Lodge not far from Taft, Oregon. The vicinity appears to have been settled by a number of Esthonian families.

After his first stroke and his return to the Allick place, the evidence conclusively establishes that he made an excellent recovery. He performed heavy work and transacted business competently and appeared much the same as before his injury. This conclusion is confirmed by the testimony of Mrs. Rice, who saw him frequently; Chesley Bones, a former school teacher and deputy assessor; Alec Sider, one of his close friends who worked for him during that period; Andrew Wendelin, a hostile witness; Vic Affalter, a Forest Service employee with whom Southman transacted business; and others. Somewhat opposed was the testimony of John Allick to whom we will refer later.

Mrs. Rice testified that, upon his return from the Marine Hospital at Seattle, Southman stated to her that if he had died she would have had everything. The evidence discloses that she had visited him at the Marine Hospital in December 1937, at which time he had expressed to her the intention "to have everything fixed that some day you won't have to work so hard."

Southman continued to live at the John Allick place and to work in that vicinity until May 8, 1939, during all of which period he was certainly in the possession of his mental faculties.

Prior to October 28, 1938, Southman became disturbed concerning property matters and was apparently under the impression that he was to be sued for breach of promise by a Mrs. Mikkal. At that time he consulted his former attorney, Edward J. Clark, who was then in Portland, with reference to the disposal of his property for the apparent purpose of avoiding loss if he should be sued. Clark advised him not to

transfer his property but to make a will instead, where-upon Southman executed a will setting forth a description of property owned by him and leaving all of his property to his "lifelong friend, Thomas Wahters." At the same time, but unknown to his attorney, he transferred about $10,000 to Thomas Wahters in trust, however, for himself.

On May 8, 1939, when Southman was in the City of Portland in connection with the securing of a pension, he suffered a second stroke, combined with a fall in which he hit his head. He was taken to the home of his friend, Wahters, where he was examined by Dr. Hunter, a competent physician, who found him with a developing paralysis on the left side, apparently accompanied by some cerebral hemorrhage. He was placed in the Portland Sanatorium until May 23, 1939, and was again taken to the Marine Hospital at Seattle. While in the hospital in Portland he was undoubtedly irrational and incompetent as indicated by the testimony of the physician and of Mr. Clark who visited him.

Immediately after Southman was taken to the Marine Hospital on May 29, 1939, letters of guardianship of his estate were issued by the Probate Court of Multnomah County to Mr. Clark. This was done upon the petition of Thomas Wahters .who alleged that Southman was a resident of Multnomah County, that he was incompetent to transact his own affairs, that his personal property did not exceed $6,000, that he had no relatives "so far as known," and that the petitioner was the sole beneficiary under a will executed by Southman. Southman was not then a resident of Multnomah County, and Wahters was then in possession of about $10,000 of Southman's money which fact he omitted to mention. Service was had upon South-

man but in his condition at that time he was not aware that he had been served or that any guardian had been appointed for him.

■ A series of letters was introduced in evidence, signed by I. Hanfeld, which were written at the Marine Hospital in Seattle and addressed to Mrs. Rice, Taft, Oregon. They were received over objection based on the fact that there was no testimony to establish that the writing of the letters was authorized by Southman. We think that they were admissible for a limited purpose. It is the contention of the contestant that Mrs. Rice, in the course of attempting to influence Southman to leave his property to her, thrust herself upon him on many occasions, and it is intimated that her trip to Seattle to see Southman was made upon her own initiative. The letters in question were competent evidence to disclose the reason for her trip. The letter of June 6, 1939, states that the author was writing for Mr. Southman: ''He says to tell you he is better every day and would like very much to have you come see him. He will pay your expenses if you can come.'' A second letter of June 12th acknowledges receipt by Southman of letters from Mrs. Rice and again urges her to come to see him. Pursuant to these letters and her friendly relationship to Southman, Mrs. Rice in June went to the Marine Hospital in Seattle.

■ On her arrival at the Marine Hospital she found Mr. Southman sitting in a wheel chair and greatly improved but considerably disturbed concerning the activities of Mr. Wahters and Mr. Clark, who had been communicating with him seeking to discover the facts concerning his property interests. He was still unaware of the guardianship. Mrs. Rice returned to Portland on June 28th and consulted Mr. Lomax, an attorney, who made an investigation and discovered

that Southman's estate had been placed under guardianship. Mrs. Rice testified that shortly after the 4th of July she received another letter written by an attendant at the hospital asking her to come to Mr. Southman and bring an attorney. Pursuant to the letter she returned to Seattle and again saw Southman at the Marine Hospital. She found that he had been worried concerning his property rights and apparently had a relapse, if not a third stroke.

At the request of Southman, communicated through Mrs. Rice, Lomax went to Seattle and conferred with Southman, during the latter part of July or early August. At that time Mr. Southman had greatly improved. Lomax held a long conversation with him concerning his financial affairs and also concerning his preparation of a will. Southman employed him to recover the money which he had intrusted to Wahters and gave him accurate information concerning the amounts involved and other business affairs, which statements Lomax by investigation verified. In securing the attendance of Mr. Lomax, Mrs. Rice made no reference to any matter pertaining to a will and she was not present when he wrote it. A will was executed at that time in the hospital by which Southman bequeathed all of his estate to Mrs. Rice with the exception of some cattle which were left to John Allick. This, however, was not the will involved in the instant contest.

During August 1939, Southman continued to improve. Mrs. Rice received another letter from the attendant at the hospital under date of August 23 inquiring when he could come home and whether Mrs. Rice could get someone to come for him in a car. Again on September 18, 1939, a similar letter requested Mrs. Rice to come for Southman on the Friday following

September 18. On September 23, Mrs. Rice went to Seattle and brought Southman back to her parents' home in Lincoln County, near Taft.

Alec Sider, who bears no relationship to Mrs. Rice, testified that upon his return he was in good spirits, was contented and greatly improved. Lomax also testified that Southman visited him on his return from the Marine Hospital at which time Southman expressed himself that ''he was extremely happy that he was going home with Mrs. Rice.'' He seemed in good spirits.

In October 1939, Mrs. Rice and Southman went to Portland for the purpose of securing the termination of the guardianship. He was examined by Dr. Sturdevant on October 12, 1939, who found that he was confused in his mind (which was the apparent result of too much excitement), and that his memory was not at that time good. Sturdevant concluded that the guardianship should be continued.

At that time the negotiations for the recovery from Wahters of the money intrusted to him by Southman were pending. Clark appeared as attorney for Wahters, and on February 8, 1940, resigned and was discharged as guardian. In his place Mrs. Rice was appointed by the probate judge as guardian of the person and estate of Southman. The evidence satisfies us that she did not seek such appointment and accepted it only because the court was of the opinion that Southman still required guardianship. He expressed himself as contented and pleased by the appointment, if a guardian was necessary. From that time on he resided at the home of Mrs. Rice's parents and was constantly under her care and protection.

The will which is in contest in this litigation was executed on July 8, 1940. Many witnesses testified to

Southman's improved mental and physical condition between September 23, 1939, and July 8, 1940. Witness Chesley Bones, a former school teacher, deputy assessor and registrar of voters, testified that in April 1940 Southman had no difficulty giving him the information concerning his property. Witness had known Southman since 1920 and saw him a number of times between April 8 and July, 1940. He saw Southman in the first week of July at Mrs. Rice's home at which time he appeared rational. Witness considered him of sound mind both in April and also in the early part of July.

Witness Almon A. Kerry, president and manager of the Lincoln County Logging Company, was designated by the Masonic Lodge of Newport to make a fraternal visit upon Southman and ascertain his condition of health and circumstance. He visited Southman on the 16th day of July, or eight days after the execution of the will in issue. In the conversation he stated that Southman was eligible to go to the Masonic Home, to which Southman replied that he had funds enough to take care of himself and preferred to stay where he was. Southman spoke of Mrs. Rice and told Kerry that he wanted "to get his property in such shape so that when he was gone, why, if there was anything left, why, she was to have it." Southman told the witness that he was perfectly contented and satisfied. "Mentally he seemed to be very bright." Witness saw no evidence of an unsettled mind.

Witness Esther Hill, a neighbor and cousin of Mrs. Rice, testified that on different occasions Southman had said he wished Mrs. Rice to have his property. In answer to a question as to his mental condition in July 1940, she said: "He was of sound mind and certainly knew what he wanted to do." She never observed anything to indicate coercion or undue influence.

Elmer Liswig, a logger and a brother of Mrs. Rice, had known Southman for many years. He expressed the opinion that in July 1940 Southman's mind was perfectly sound. His wife, Jean Liswig, saw Southman frequently and testified that he got along well with Mrs. Rice and that he listened to the news programs with great interest. She testified that suspicion of mental incompetency "never entered my mind at any time." Ulias Grant Niemi, a cousin of Mrs. Rice, and Susannah Niemi, his wife, testified to similar effect. Alec Sider, a close friend, testified that in April 1940 Southman was sound mentally.

I. O. Niemi, a neighbor and a cousin of Mrs. Rice, saw Southman many times after his last return from the Marine Hospital. He testified that Southman expressed considerable interest in the European war, and knew of many of the places where it was going on. "He had a very good memory, especially of things that happened years ago." He testified that Southman several times had said he was going to give what was left to Mrs. Rice. The last time the statement was made was in August 1940 subsequent to the execution of the will. Witness testified that in July 1940 Southman was in such frame of mind that he knew what he was about in making a will. Helen Niemi, wife of I. O. Niemi, a neighbor and school teacher, saw him frequently after he returned from the hospital. She visited him in July 1940, and stated that he was interested in current events and community affairs. She considered that he had a good memory and was very shrewd. She testified that in 1939 Southman expressed the intention that when he died "whoever takes care of me at the end can have it."

Margaret Rice, the daughter of Adeline Rice, was a beneficiary under the will to the extent of a thousand

dollars. She testified that Southman liked to live with them and that he expressed interest in her education. He wanted her to go to college after high school graduation and thought maybe she should go to Corvallis. He had told her: "If Uncle Edward would put up one thousand dollars, he would put up the other." He thought two thousand dollars would enable her to get a college education.

Vic Affalter, the Forest Service employee, was well acquainted with Southman, knew him in 1938 when he was living with John Allick, visited him three times in the Marine Hospital in Seattle, transacted business with him, and never observed any mental unsoundness on his part.

Jacob Nielsen had known Southman intimately since 1916 or 1917 and worked with him. He saw Southman the last time in February 1940. In February 1940, Southman visited at his home. In the absence of Mrs. Rice, Southman told the witness that he was going to leave his property to Mrs. Rice. Witness testified that Southman knew his business and what he was going to do with his money. Witness considered him mentally all right.

The evidence discloses that the mental condition of the testator varied considerably from time to time. For brief periods immediately following each of the three strokes his mind was affected, but in each instance his hearty constitution threw off the effects of the cerebral hemorrhage, not only as to his mental powers but also as to the severity of his physical paralysis. The direct evidence relative to his condition on and near July 8, 1940, overwhelmingly establishes that he was competent on that day.

Mr. Lomax, the attorney, testified that Mrs. Rice, as guardian acting under his advice, was attempting

to get a settlement of the controversy between Southman and John Allick. Allick had previously deeded his place to Southman in apparent satisfaction of a debt and refused thereafter to vacate the premises. Mrs. Rice asked Lomax to come down and render assistance. He arrived on July 8. The conversation between Southman and the attorney was "principally" concerning John Allick. Southman wanted Allick to pay $3,000 for the farm or to vacate it. It will be recalled that while at the Marine Hospital, Southman had made a will in favor of Mrs. Rice in which he also bequeathed two head of livestock to John Allick. Concerning his conversation with Southman on July 8, 1940, Lomax testified:

"A He said he wanted to draw a new will and not to leave any property to Mr. Allick. The property he had reference was those two head of livestock.

"Q How did he appear at that time as to his physical condition?

"A He was still limping from that stroke but his mind was absolutely clear. * * *

"Q Was he wrong on any point in what he said as far as you could discover in any matter relating to his business?

"A Oh, absolutely not, no. He and I discussed John Allick being on the place up there, what the place was worth. To his way of thinking he said it was worth three thousand dollars. He told me how he had acquired it from John Allick. Said that John hadn't paid him the rental on it. They had cut the hay off the place and had made no payment to him for that. He said Allick had treated him just about like Mr. Wahters had."

In accordance with Southman's expressed desire to execute a new will on that day, Mrs. Rice, Southman and Lomax went by car first to the John Allick

place to which Southman held a deed. After inspecting the premises, they went to Taft, borrowed a typewriter, and, at the home of Mrs. Slade, Lomax drew the will now in issue. The will was read to Southman. Lomax testified:

"A He said that was the way he wanted his will drawn, and I believe he asked me concerning Mrs. Rice's daughter's educational fund, asked how far I thought it would take the daughter through school.

"Q That's the lady named Margaret Loraine Rice in the will?

"A Yes.

"Q The one who had [been] given the sum of one thousand dollars to be used for her education?

"A That's right, yes. At the same time he mentioned and wanted to know how long it would take me to get John Allick off the place."

The will was then executed, Mrs. Rice, Mrs. Slade, Abrams, who was the proprietor of the general store at Taft, Mr. Southman, Lomax, and a boy, Billy Niemi, being present. Mrs. Slade and Mr. Abrams in whose presence the will was executed, signed as witnesses, after Southman had answered that he desired them to do so. Mr. Lomax testified:

"Q From the conversations you had with him and the conduct on his part, did you form any opinion as to the state of mind?

"A I did, yes, sir.

"Q What was your opinion at the time the will was prepared and executed?

"A Read that question.

(The reporter reads the last question.)

"A He was absolutely of sound mind.

"Q Did you see or hear anything which attempted to tell Mr. Southman or had a tendency

to tell him what he should do or should not do in the disposition of his property?

"A Absolutely not."

The testimony of Lomax was strongly confirmed in detail by that of the subscribing witnesses. Abrams testified to the discussion concerning the educational fund for Mrs. Rice's daughter. Mrs. Slade testified:

"Q To your knowledge was any suggestion made by anyone to Mr. Southman as to what he should do with his property?

"A No, there wasn't."

Both witnesses were of the opinion that Southman understood the nature of his act and was competent at the time. Sylvia Liswig, the school teacher and sister to Mrs. Rice, saw Southman on July 8, 1940. She testified that "he was in very good condition." Mrs. Esther Hill saw Southman "about every week" during the last part of his life. Her testimony strongly supports the contentions of proponents on both issues.

Lastly, we have the testimony of a physician who treated Southman from April 12 to August 6, 1940, during which time the testator was suffering from a heart ailment. Dr. John M. Hohl of Taft made three house calls upon Southman subsequent to April 12, 1940. Southman recovered from the heart condition under the doctor's treatment. On August 6, 1940, about a month after the execution of the will and a month prior to his death, Southman called at the office in Taft for a physical check-up. Dr. Hohl testified:

"Q Did you discover any evidence of mental confusion in any conversation you had with him?

"A No, he answered the questions very intelligently. * * *

"A His mind was all right up until the first of September when he went into a coma as a result of his failing heart.

"Q The will which is here under contest was signed by him on the 8th day of July, 1940. From your observation of him before that date and afterwards what would you say that the condition of Mr. Southman's mind was at the time the will was made?

"A Well, his mind was perfectly all right."

It is urged that many of the witnesses for proponents were related to Mrs. Rice by blood or marriage, and this is true. But the issues arose in a small isolated Esthonian community near Taft and of necessity the witnesses were drawn from those who knew and observed the testator during the period in question, and most of the qualified witnesses were also relatives. But the inference of interest or bias cannot be applied to the proponents' witnesses only. John Allick, who testified for the contestant as to the physically and mentally weakened condition of the testator, was involved in a contest with Southman and his guardian over property rights. He was 79 years old at the time of trial and testified by an interpreter. He participated in a meeting at the home of Mr. Wendelin which had been planned for two weeks and which occurred a few months before the trial. Most of those present were active in support of the claims of the Esthonian relatives of the testator. Among them were Mr. Hansen and Mrs. Mikkal, previously mentioned in connection with the feared or threatened breach of promise suit. According to Allick, these persons thought "they should talk this over about informing the heirs so that they would not be left without knowledge." He expressed the interest of Wendelin and Hansen thus, by interpreter:

"Q What is Mr. Wendelin's interest in the case?

"A It is this: It is the same thing that, why should relatives be left without any knowledge of

this? That when the matter is up to somebody—that someone should see something about it, the way he states.''

Allick testified to an alleged conversation in English with Mrs. Rice in which she asked for a rope to tie Southman to his bed. He told of this at the trial in the Finnish language. The narrative is quite unbelievable. Mrs. Rice testified that she merely said that she was getting the rope to tie a mattress to the automobile for transportation.

There is some evidence that many years prior to the execution of the will a nephew living in Esthonia wrote to Southman asking for money. Southman did not respond. Southman's attitude toward his relatives is illustrated by the testimony of Mr. Clark, a witness for the contestant, who testified that, at the time of the preparation of the will in favor of Wahters in October 1938, Southman informed him that he had relatives in the old country.

''I said, 'Do you want to make any provision for them?' He said, 'No, they never done anything for me and I don't owe them anything.' He said, 'I want it all left to Mr. Wahters.' ''

Ella Liik, who testified concerning Southman's condition on certain occasions when he was in Portland, was the daughter of Mr. Wahters. Wahters, it will be recalled, was the intimate friend of Southman who received ten thousand dollars in trust and then denied that he had received it, but ultimately under pressure disgorged the money. Her bias is indicated by the testimony of Mrs. Rice, who states that when the final twelve hundred dollars was paid over by Wahters, his daughter ''went on like it was her Dad's money and not Southman's money. She said she hoped he choked on it.''

Anton H. Hansen was the principal witness for the contestant. His interest in the litigation is manifest to the casual observer. The record indicates that he made long and expensive inquiries in Esthonia for the purpose of finding the relatives of the testator. This he claims was with the acquiescence of Southman though at his own suggestion. He received information concerning Southman's relatives but for some months neglected to inform Southman concerning his discoveries. The record contains much correspondence between Hansen and the relatives, and between Hansen and various Russian officials concerning the case. He sent money to the contestant in Esthonia on a number of occasions. He employed the attorneys who represented her. He claims to have been acquainted with Southman and his relatives in Esthonia when Southman was a youth. Concerning this the trial court stated:

"As far as I am concerned, why, it would be very difficult for me to believe his testimony about this man seeing those people in that country. I can't believe it."

He claims to have had no financial interest in the case. But the witness Alec Sider testified concerning Hansen:

"He tell me 'if we win and get this case there will be money in it for you.'"

We concur in the finding of the trial court that Hansen did satisfactorily produce evidence that the contestant Ann Lumeon was in fact a sister of the testator; but, upon the issues of competency and undue influence, we find Hansen's testimony seriously discredited. We conclude that on July 8, 1940, Southman was competent to execute a will.

We turn to the issue of alleged undue influence. With the sole exception of the testimony of John Allick concerning the rope, the substantial and un-contradicted evidence supported by many witnesses establishes that from the time of his first injury in 1937 Mrs. Rice gave to the testator capable and kindly care and attention until the day of his death. During a considerable portion of this period his paralysis was such as to require constant care and assistance. That she may have expected to be a beneficiary under his will, we do not doubt. But unless kindly, continuous and efficient nursing is to be deemed undue influence, his will cannot be upset on any such ground. Though she was present at the time of the execution of the will, the evidence discloses she took no part in the conversation concerning it. At least five wit-nesses testified that at various times over a period of years, between 1937 and July 1940, Southman ex-pressed the intention to leave his property to Mrs. Rice and her daughter. At least four witnesses testi-fied that Southman had stated his intention to leave his property to whatever person was "kindest to him at the last." Mrs. Rice was certainly that person.

The only evidence in the record which might in-dicate a direct attempt by Mrs. Rice to induce South-man to make a will in her favor comes from John Allick and Anton Hansen. They testified that they met at the Liswig place, together with Alec Sider, and visited with Southman and Mrs. Rice. They assert that Southman was crying over the fact that Wahters had taken his money and that Mrs. Rice comforted him saying: "Wahters is not a good man; don't leave him anything. Leave it to me." Hansen states that in that conversation he was taking the part of John Allick and seeking to persuade Southman not to eject

Allick from the property to which Southman held the deed and which Allick refused to vacate. Both witnesses testified that this purported conversation occurred in September 1939. Previous to this time Wahters had in fact violated his trust and Southman had been informed of the facts. Two months before the alleged conversation, Southman had made a will which revoked the bequest to Wahters and left everything except some cattle to Mrs. Rice. Mrs. Rice and Alec Sider both flatly deny that any such conversation took place in September 1939 or at any time.

The burden of proof of due execution and testamentary capacity was upon the proponent. *In re Lambert's Estate,* 166 Or. 529, 114 P. (2d) 125; *In re Sturtevant's Estate,* 92 Or. 269, 178 P. 192. The appointment of a guardian for one who is non compos mentis raises a presumption of mental infirmity; but, even in the case of guardianship for insanity, such presumption may be overcome by evidence that at the time of the execution of the will the testator was of disposing mind and memory. *In re Lambert's Estate,* supra; *Snyder v. De Remer,* 143 Or. 414, 22 P. (2d) 877; *Clark v. Clark,* 125 Or. 333, 267 P. 534; *Collins v. Long,* 95 Or. 63, 186 P. 1038, 8 A. L. R. 1370; *In re Sturtevant's Estate,* supra; *Ames Will,* 40 Or. 495, 67 P. 737. Even an insane person may make a valid will during a lucid interval. *Snyder v. De Remer,* supra. It must be remembered that Southman was not placed under guardianship on account of insanity. The probate court found that because of sickness and disability resulting therefrom he was incapable of conducting his own affairs. The distinction is important. See 2 Page on Wills, 586, 587.

The courts have frequently considered the making of an unnatural will; i. e., one not consistent with the

claims of duty and affection, to be a circumstance tending to support the claim of incapacity. *In re Kober's Will,* 132 Or. 421, 285 P. 1032; *Holman's Will,* 42 Or. 345, 70 P. 908. On the other hand a bequest to the natural objects of his bounty may raise an inference favorable to the validity of the will. *In re Knutson's Will,* 149 Or. 467, 41 P. (2d) 793. The evidence here discloses that for many years Southman had not considered any relatives in Esthonia as the natural objects of his bounty. He had at times even denied their existence, whereas every impulse of gratitude indicated Mrs. Rice as the proper object of his bounty. Some courts have even held that nephews, nieces, brothers and sisters are not by reason of such relationship the "natural or normal objects" of a testator's bounty, the class to which the rule applies being limited to descendants, surviving spouse and parents. *Estate of Nolan,* 25 Cal. App. (2d) 738, 78 P. (2d) 456. But we need not go so far as to congeal a reasonable inference into a rule of law. The rule concerning "natural objects of bounty," if there be such a rule, has no application against the proponent here. On the contrary, the comment from *Van Alst v. Hunter,* 5 Johns. Ch. 148, quoted with approval in *In re Sturtevant's Estate,* is pertinent:

"It is one of the painful consequences of extreme old age that it ceased to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life to command the attentions due to his infirmities. The will of such an aged man ought to be regarded with great tenderness, when it appears not to have been procured by fraudulent arts, but contains those very dispositions, which the circumstances of his situation, and

the course of the natural affections dictated." *Van Alst v. Hunter,* 5 Johns. Ch. 148, 160.

Contestant relies on *In re Faling Will,* 105 Or. 365, 208 P. 715, and *In re Kober's Will,* supra, in support of the rule that any marked change in a person's habits and thoughts is evidence of mental unsoundness. Such evidence is undoubtedly relevant; but in the case at bar there is none. Southman manifested a consistent lack of interest in his Esthonian relatives and an equally consistent regard for Mrs. Rice. The rule of the Faling case operates in reverse in the case at bar.

■ As to the claim of undue influence, the burden of proof was upon the contestant. *Estate of Allen,* 116 Or. 467, 241 P. 996; *In re Sturtevant's Estate,* supra; *In re Dale's Estate,* 92 Or. 57, 179 P. 274. And the burden never shifts. *In re Brown's Estate,* 165 Or. 575, 108 P. (2d) 775.

■■ The existence of a confidential relationship, such as that of guardian and ward, when taken in connection with other suspicious circumstances may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference. The fact that Mrs. Rice was the guardian of the testator requires that we examine the record with great care in search of any other suspicious circumstances, but the fact of such confidential relationship is not determinative in view of the evidence which strongly preponderates in favor of the beneficiary.

■■ The rule is well settled in this state that undue influence must operate at the very time of the execution of the will. *Estate of Allen,* supra; *In re Sturtevant's Estate,* supra. In the case at bar there is no evidence

of any undue influence operating at the time of the execution of the will. The mere fact that Mrs. Rice was present though not participating at the time of the execution of the will is a circumstance for consideration, but it is not controlling. *In re Faling Will,* supra; *In re Knutson's Will,* supra.

■ In a case of this kind much depends upon the apparent reliability of the witnesses as they appear on the stand. The trial judge profited by the opportunity for personal observation which is of necessity denied to an appellate tribunal. We find his conclusions sound, and the decree is affirmed.