·Argued January 24; reversed April 7, 1936.

In re Bundy's Estate
ROWLAND et al. v. COULSON
(56 P. (2d) 313)

*Warren A. McMinimee,* of Tillamook (George P. Winslow, of Tillamook, on the brief), for appellant.

*Custer E. Ross,* of Salem (Ronald C. Glover, of Salem, on the brief), for respondent.

ROSSMAN, J. Clark Bundy died January 16, 1934, aged 91 years. Two days later his daughter, Roxy B. Coulson, proponent, presented in the county court of Marion county for probate as the will of the deceased the document which is now under attack. It bears the signature of Bundy and the attesting signatures of Frank Wodzewoda and Nellie Simpson. The value of the estate is approximately $7,800.

June 5, 1934, all of the heirs of the decedent, with the exception of the proponent, filed in the county court a petition contesting the validity of the purported will. The contestants are a daughter of the decedent living in Tillamook county, a son living in Columbus, Ohio, and four children of a deceased son also living in Columbus, Ohio. The petition charges that (1) the proponent "by false and fraudulent statements and accusations poisoned the mind of the decedent against the other heirs"; (2) the proponent "exercised undue influence upon her father by showering her attention on decedent for the purpose of getting him to execute a will in her favor"; (3) the decedent lacked testamentary capacity November 16, 1933; and (4) "the said purported will was not signed by the said Clark Bundy, nor was the same attested in that the alleged witnesses, Frank Wodzewoda and Nellie Simpson, did not execute said purported will in the presence of the testator; that said alleged witnesses, Frank Wodzewoda and Nellie Simpson, did not subscribe their names

as witnesses at the request of the said testator; that said alleged witnesses did not see the testator sign his signature or hear said testator acknowledge said in-strument as his last will and testament or hear him in any manner indicate that it was his last will; that the said witnesses signing this purported instrument did not subscribe their names in the presence of each other.'' All of these charges are denied in the reply.

During the last six years of his life the decedent made his home with the proponent upon a farm a few miles outside of the city of Salem. In the last few months of his life Bundy became very feeble physically, and about September 15, 1933, became incapacitated to such an extent that he could not arise from a chair nor walk without assistance. His mind, however, was still alert and he enjoyed conversation. His favorite topics were his experiences of bygone days in Ohio. While his hearing was good, his eyesight had become so dim that he could no longer read. Apparently, he did not use glasses.

Mr. Ronald C. Glover, an attorney who maintains his office in Salem, gave the following explanation of the preparation of the will. In 1932 he had successfully conducted some litigation for Bundy. The judgment in Bundy's favor remained unsatisfied until late in 1933. In the early part of that year Bundy called upon him frequently concerning the collection of the judgment, and beginning in May, 1933, mentioned the prepara-tion of a will. In the early part of November, 1933, or thereabouts, Bundy returned, bringing with him a cancelled will so that Glover could obtain from it the names of his heirs, and requested him to prepare a new will. After he had expressed his wishes concerning the disposition of his estate, and Glover had dictated

the will to one of his stenographers, Bundy directed Glover to mail the document, together with the cancelled will, to his home. He stated that he knew how to execute a document of that kind. Glover complied with this instruction. Bundy never returned, and never again spoke to Glover about a will.

After Bundy's death Mrs. Coulson, the proponent, brought to Glover the testamentary document now under review. After the two witnesses had signed the necessary affidavits Glover presented the document for probate in common form. Its probate was ordered. As a witness in the present proceeding, Glover identified the instrument which had been admitted to probate in that manner as the document which he had prepared at Bundy's request, depending, to a considerable extent, upon the fact that he recognized some of the phraseology as peculiarly his own. This instrument provides that the decedent's body should be interred in a cemetery at Chesterhill, Ohio; that his son should receive $5; that his four grandchildren should each receive $50; that his daughter, Mrs. Rowland, should receive $100; and that the proponent should have the residue of the estate. It nominated the latter as executrix. This will is written upon letter-size paper (8½ x 11 inches) of an inferior grade. While its phraseology is excellent, the typing is very poor; for instance, the left margin is noticeably irregular; the first page is double spaced and the second, single; the spacing between words and after punctuation is irregular; and some of the lines are not parallel to others. The typing on the second page begins within half an inch of the top of the page. The two pages are fastened together with a single wire clip which does not penetrate the paper, and the document is not backed.

Glover explained the poor appearance of the will by saying that he prepared it tentatively. Apparently, he expected Bundy to return to his office before executing the will. Glover also explained that, according to his belief, he dictated the will to a young stenographer who had only recently entered his employ. He described her as inexperienced. She was temporarily absent from the state at the time of the trial and her shorthand note book, according to Glover, had been inadvertently destroyed. No carbon copy of the will was produced, and Glover did not state whether he keeps copies of such instruments.

The proponent testified that on November 16, 1933, her father asked her to date the draft and that she did so. She also testified that at this time Mrs. Nellie Simpson and Frank Wodzewoda, neighbors, were in her home. Mrs. Simpson testified that while she, Wodzewoda, the proponent and the decedent were present, the latter asked her to attest his signature to the will, and that she did so. She, Wodzewoda and the proponent swore that the will was not read aloud at that time. Wodzewoda, although he had signed the attesting clause which stated that he signed the will at the request of the decedent and in his presence, as well as in the presence of Mrs. Simpson, and although he had also signed an affidavit containing similar statements, preparatory to the probating of the will in common form, swore on the trial that the decedent had not asked him to become an attesting witness; that Mrs. Simpson was not present when he signed his name; that he signed at the request of the proponent; and that he did not see decedent sign.

Upon the trial much time was consumed in an effort to prove that the will produced, and bearing

Bundy's signature, was not typed in Glover's office, but was typed by the proponent upon a typewriter owned by her. This charge is included within the general averments of the petition, but hardly within its specific charges. However, no objection was made that this proof was not admissible under the allegations of the petition. This charge is based upon the following circumstances: (1) Bundy was unable to walk at the time he is said to have entered Glover's office in November, 1933; (2) proponent owned and operated a typewriter which had precisely the same type as the typewriter on which the will was written; (3) proponent possessed and used stationery of the same quality and size as the stationery upon which the will was written; (4) the will and letters written by the proponent upon her typewriter were typed with a black ribbon, whereas Glover's typewriters were equipped with blue ribbons; and (5) letters written by the proponent upon her typewriter at about the time the will was written show the same defects in alignment that appear in the will. We add to this last specification the following explanation. Wherever the combinations st, ra, ha, fa, an, im and ea appear in the will and in the letters written by the proponent upon her typewriter, one of the two letters in the combination is out of alignment.

In November of 1933 Glover had three typewriters. Two of them did not produce work similar to the will. But the type on the third was the same as that found in the will, with the exception of the numerals. This machine was partially out of alignment. Its misalignment, while in some particulars similar to the misalignment of the machine upon which the will was written, in other particulars was different. According to Mr. W. I.

Staley, an expert, the numerals appearing in the will (1, 2, 3, 5, and 9) are Art Gothic. Glover's machines are not thus equipped. The proponent's typewriter was not produced at the trial, but seven letters and two postal cards which she wrote upon it were produced by the contestants and indicate that her typewriter was equipped with Art Gothic numerals. Mr. Staley swore that Art Gothic figures ''are not furnished regularly on any standard machine. They are only on a standard machine when ordered put on by the buyer. They are not standard equipment.'' He added, however, that they appear on ''three-bank Coronas or old three-bank Underwood Portables''. Glover swore that one of his typewriters was out of his office for repairs on October 16 and November 3, 1933, and that while it was being repaired a substitute machine was in use. He did not remember the make or kind of the latter. The typewriter dealer did not testify. No originals or carbon copies of work typed on this machine were produced. Glover also swore that his office ''usually uses a record blue ribbon on instruments of this kind. I use the purple when we copy it in the copy book''. This will and proponent's letters were written with black ribbons. The proponent was asked to state when she acquired her typewriter and the following then ensued:

''Q. You have a typewriter at your house, haven't you? A. There is one at the house, yes.

''Q. One that has been used there for a long time? A. No.

''Q. How long?''

An objection was interposed and during the argument that ensued the question was apparently forgotten. Later the following occurred:

''Q. You have only one typewriter? A. That is all I have.

"Q. If you could recall about when you got it, it would help some. A. Oh, I don't remember that.

"Q. Years ago? A. I tell you I don't know now, and I don't. I didn't make a note of that.

"Q. Quite a while ago, wasn't it, two or three years? A. I don't know how long, I told you."

Here proponent's counsel interposed an objection and the parties did not return to the question. Proponent's attitude did not manifest frankness. She did not disclose the name of the manufacturer of her typewriter nor produce the machine at the trial.

Mr. Staley, the expert to whom we have previously referred, expressed an opinion that the typewriter on which the proponent's letters and cards were written was the same machine on which the will was written. He fortified his opinion by pointing out the similarities which we have already mentioned.

The nine letters and cards which the proponent wrote upon her typewriter were introduced in evidence and are before us. All but one are dated. The eight that are dated were written in the period of July 3, 1933, to November 8, 1933. We have examined all nine of them carefully. In addition to containing the similarities to the typing of the will previously mentioned, and which was pointed out by Mr. Staley, they contain the following additional similarities to the will. In all nine instances the left-hand margin, like the left-hand margin of the will, is noticeably uneven. As in the will, an occasional word or line fails to run parallel to the line above and below, due, possibly, to the paper slipping in the machine. The will makes unusual use of the colon as a punctuation mark; for instance, it is used in place of a decimal point in the sums of $50.00, $100.00 and $200.00. The $50.00 sum appears three times in

the will and in each instance the colon is used in place of a decimal point. Colons also appear frequently and in unusual places in proponent's letters and cards. In the letters and cards we find the same irregularity of spacing after punctuation that appears in the will.

After Mr. Staley had given his above-mentioned testimony and had expressed his opinion that the will was written upon the proponent's typewriter, the proponent did not deny that she wrote the will. There is no denial in the record that she rewrote or tampered with the will. Proponent returned to the stand after Mr. Staley had testified, but was not asked whether the will under attack came off her machine, and volunteered no information upon the subject. Nor has anyone denied the charge for her. She does not even contend that there is any dissimilarity in the typing of the will and of her letters, and our examination reveals none. Although she testified that she wrote into the will by hand the words "16th" and "November", she did not explain how the will came into her hands at that time. As stated in a preceding paragraph, Glover testified that he mailed the will to Bundy. How it got from the letterbox at proponent's farm into Bundy's hands is not disclosed. All observers testified that at that time Bundy could not walk without assistance. When he was taken from place to place in the house the chair in which he was seated was frequently shoved to the place where he wanted to go. This being true, Bundy evidently did not go to the letterbox for his mail. Some one got his mail for him. The proponent, who must have known who went to the letterbox for the mail, did not furnish the information. Next, all agree that, due to his weakened eyes, Bundy could no longer read. The proponent handled at least some of

his correspondence for him. If any one else opened his letters and wrote his replies, the proponent did not disclose the identity of that individual. It seems fair to assume from the record that the proponent was the one who acquainted her father with the contents of his letters. This being true, we have a right to infer that the proponent took out of the letterbox the envelope from Glover which contained the draft of the will and the cancelled document. If she did, she had an opportunity to rewrite the will on her typewriter. If she rewrote the will by merely altering the amount of a bequest, the alteration could readily have escaped Mr. Glover's detection when he was identifying the will upon the witness stand. He did not claim that he was able to recall the amounts of the bequests which decedent desired his legatees to receive. In testifying that the will produced is the one which he dictated to his stenographer, he based his belief, not upon the figures but upon portions of the phraseology concerning the payment of the decedent's debts, the transportation of the remains to Ohio, etc. We believe that he was endeavoring to tell the truth. But, before arriving at a conclusion concerning the charge that the proponent wrote the will upon her typewriter, let us take note of one or two particulars which shed some light upon her veracity.

It will be recalled that Glover testified that when the decedent called upon him he brought with him an old will which had been revoked, so that he could obtain from it the names of the heirs. It is clearly evident from Glover's testimony that this old will was then complete. We say that this is clearly evident because of two circumstances which we shall now mention: (1) After Glover had read the old will he suggested to

Bundy that a codicil might suffice; surely he would not have made such a suggestion if a part of the will was missing; (2) Glover, as suggested by Bundy, obtained the names of the latter's heirs from the old will, but could not have done so from the second page only. When the proponent produced this old will she brought only the second page. The page she brought does not contain the names of four of the heirs. In endeavoring to account for this condition, she swore that after this old will had been executed, and before the new one had been drafted, her father tore off the first page and burned it. It will be observed that this testimony is at variance with Glover's testimony. We are strongly inclined to believe that the revoked will was complete when it was brought to Glover's office. Whether or not the proponent had a purpose in withholding the first page of the old will, the conflict between her testimony and that of her attorney discredits her veracity. Besides this circumstance, we also noticed in reading the transcript the reluctance with which the proponent identified the letters and postal cards which she later admitted she had written upon her typewriter. These letters and cards were but recently written and had been sent to relatives. They spoke of matters of an intimate nature. So far as we can observe, there was no occasion for being reluctant and hesitant if the proponent was endeavoring to be frank.

From Osborn, Questioned Documents (2d Ed.), p. 592, we quote:

"If a specimen of typewriting shows clear impressions and includes numerous characters and there are at hand suitable standards of comparison, it becomes possible to show with the highest degree of certainty, by the combination of these five classes of characteristics, that a document was, or was not, written upon a

certain machine. * * * The work of any number of machines inevitably begins to diverge in different ways as soon as they are used and, as there are thousands of possible particulars in which differences may develop, it very soon is possible to identify positively the work of a particular typewriter if the writing in question includes clear impressions of a sufficient number of the characters and sufficient amount of genuine writing is furnished for comparison.''

The proof that the proponent substituted a will written by herself for the one prepared by Mr. Glover is circumstantial, but not contradicted. It is fact or real evidence, and its persuasiveness is not dependent upon the truthfulness of any witness. Its cogency is dependent only upon whether it negatives all competing inferences. As the number of circumstances from which a given conclusion is generally drawn by the process of deduction multiply, the propriety of drawing the conclusion becomes more logical. In other words, as the circumstances multiply they dispel competing possibilities. In the present instance, since Art Gothic numerals are not regular equipment upon standard typewriters, it would be remarkable if in the Salem district there were two typewriters with such type. It will be observed from the statement quoted from Osborn that no two typewriters develop the same characteristics, yet, if we are to believe that this will was written upon a typewriter which happened to be for a day or two in Glover's office, we must then be prepared to believe that that machine had developed precisely the same characteristics as the proponent's typewriter. We would also have to believe that Glover's stenographer, who was a high school girl, was guilty of the same errors of punctuation that were being made by the proponent. Moreover, we would also have to conclude that,

although Glover's office always uses blue typewriter ribbons, except when preparing material for the copy press, upon this occasion it chose the same color of ribbon that the proponent was using. We would also have to believe that, by chance, the stenographer typed an important instrument such as a will upon exactly the same size, kind and quality of stationery that the proponent had been using for letter writing purposes. Without reviewing the circumstances further, we can express their effect thus: We must either be prepared to conclude that this circumstantial evidence proves that the proponent typed this will, or believe that Glover's office and proponent's humble farm home could produce exact facsimiles of the will.

■■■ Upon the proponent rested the burden of proving that Bundy knew the contents of the document which he signed. Glover's testimony in which he swore that Bundy was present when he dictated the will to his stenographer established that fact, if the will decedent signed is the one Glover mailed. Upon Glover's testimony the proponent depends exclusively to prove knowledge. The law presumes that a deceased knew the contents of the testamentary instrument which bears his signature. But if the document which Bundy signed was not the instrument which Glover dictated in his presence, then we have no proof that he knew the contents of the document now before us. Certainly, Bundy thought that the instrument which he was signing was the one which he had directed Glover to prepare. If he was mistaken in this assumption and another instrument had been surreptitiously substituted in its place, then the signature obtained in that manner does not entitle the fraudulent instrument to be probated as Bundy's will.

■ We believe that the evidence mentioned in preceding paragraphs, circumstantial though it be, indicates that the instrument which Bundy signed is not the one which Glover prepared. If the proponent wished to avoid the inferences arising from this circumstantial evidence, she should have made an appropriate explanation. Upon her rested the burden of proving that Bundy knew the contents of the document which he was signing. In our opinion, she has not discharged this burden of proof. The decree of the circuit court is reversed. The instrument of November 16, 1933, is not entitled to probate.

CAMPBELL, C. J., and KELLY and BELT, JJ., concur.