Argued September 17; affirmed October 19, 1943

In re Davis' Will

ISRAEL *v.* DAVIS et al.

(142 P. (2d) 143)

Before BAILEY, Chief Justice, and ROSSMAN, LUSK, BRAND and HAY, Associate Justices.

*Barnett H. Goldstein,* of Portland, for appellants.

*Frank J. Lonergan,* of Portland (Leon W. Behrman, of Portland, on the brief) for respondents.

HAY, J. This is an appeal from a decree of the circuit court of Multnomah county, sustaining the validity of the last will and testament of Isaac K. Davis, deceased.

Isaac K. Davis emigrated from Russia to the United States when he was a very young man. He settled in Portland, and, within a few months, sent to Russia for his intended bride. When she arrived in this country, they were married. They spent all of their married life of thirty-five years in the city of Portland. Two children were born to them—a daughter, Katherine, now Mrs. Mark Israel, and a son, Daniel. These children are usually called respectively "Katie" and "Dan". Mr. Davis, very shortly after arriving in Portland, took up the business of buying and selling burlap bags. At first his operations were very small. He had no fixed business premises, but plied the itinerant trade of a horse-and-wagon peddler. By thrift and industry, he established eventually a substantial business, which he conducted in Portland for many years, under the name of Davis Bag Company.

Some time in January, 1941, Mr. Davis began to suffer from the ailment from which he subsequently died. After consulting a physician and a dentist, he had all of his teeth extracted. Three visits to the dentist were made for this purpose, with sufficient time between each to allow the patient to recuperate. During these visits, Mr. Davis apparently was moody and depressed, and occasionally wept. His daughter, Mrs. Israel, accompanied him to the dentist, and seemed to have considerable control over him in his fits of weeping. The removal of the teeth did not have the desired effect of improving his health. Afterwards, he consulted Dr. George A. Cathey, on whose advice he entered a hospital in Portland for observation and treatment. He remained in the hospital from March 12 to March 16, 1941. Dr. Cathey at that time consulted with Dr. John Raaf, a brain specialist, regarding the case.

X-rays of the skull were taken, and the condition was diagnosed tentatively as a right cerebral neoplasm (tumor) and a right cerebral vascular change. Some six weeks prior to this, Mr. Davis had suffered a stroke, which brought about a partial paralysis of the left arm and left leg, and restricted the field of vision of the left eye. The physicians desired him to submit to a test which involved the withdrawal of fluid from the spinal column and the injection of air therein, an operation which is technically called an encephalogram. It has the effect of enabling the technician to take X-ray photographs of the skull which demonstrate, more clearly than ordinary X-ray photographs do, an abnormal condition of the brain. As the physicians advised that an immediate operation might be necessary thereafter, Mr. Davis determined, largely upon the insistence of Mrs. Davis, to go to San Francisco to have the test and the subsequent operation, if such was found necessary or advisable, performed by Dr. Naffziger, a brain specialist. Dr. Cathey made the necessary arrangements with Dr. Naffziger, and, on March 18, 1941, advised Mr. and Mrs. Davis that such arrangements had been completed. It was then decided that Mr. and Mrs. Davis, with Mrs. Israel, should travel to San Francisco by train, leaving Portland on the following evening.

At that time Dan Davis was in San Francisco on business for the firm, having traveled there by plane a day or so previously. He returned to Portland on March 19th, and had a conference with his father in the family home, where he, a young man of 21 years, also resided. According to Dan's testimony, his father, on that occasion, asked him to go to the office of Mr. Leon Behrman, Mr. Davis's attorney, and procure Mr.

Davis's will, in order that he might execute it. Dan telephoned to Mr. Behrman, and was informed by him that the will had not actually been prepared. Mr. Davis had consulted Mr. Behrman at different times during the period from September, 1940, to January, 1941, in reference to making his will, and Mr. Behrman had made written memoranda of Mr. Davis's desires in the premises. Following the telephone conversation, Mr. Behrman drew the will, and thereafter Dan Davis called for it. The will is brief and succinct. By its terms, Mr. Davis bequeathed $100 to each of his children, Katherine and Daniel, and $50 to each of Katherine's children. The residue of his estate he devised and bequeathed to his wife Anna, whom he nominated as executrix, to act without bonds.

After having procured the will, Dan Davis went to the premises of the Davis Bag Company and asked William E. Fandrey, the company's foreman, to accompany him to the Davis home. He did not, however, at that time inform Mr. Fandrey of the purpose of the visit. When they arrived, there were present in the house Mr. Davis, his sister, and Gordon D. Bailey, a male nurse. After a brief conversation, the will was signed by Mr. Davis and witnessed by Bailey and Fandrey. Later in the evening Mr. Davis, with his wife and daughter, left for San Francisco, where Mr. Davis was under the care of Dr. Naffziger for some little time. No surgical operation was performed, and Mr. Davis returned to Portland. His condition became progressively worse, and he died on October 18, 1941, aged 56 years.

On October 30, 1941, the will was offered for probate by the widow, and was thereupon probated in common form. For this purpose, the affidavit of only the

witness Fandrey was used, the proponent having been unable to discover the whereabouts of the witness Bailey. In due course Mrs. Israel contested the will, alleging as grounds (1) fraud in its execution, (2) mental incompetency of the testator, and (3) undue influence. Issues were made up, and a hearing was had before Honorable McDannell Brown, judge pro tempore. After the hearing, the court denied the petition, and adjudged and decreed that the purported will was the last will and testament of I. K. Davis. Mrs. Israel has appealed to this court.

It was incumbent upon the proponent to establish that the will was valid, and that it was executed and attested in the manner required by law. Those requirements are found in section 18-201, O. C. L. A., which reads as follows:

"Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will, in the presence of the testator."

The decision to take Mr. Davis to San Francisco for treatment had been arrived at without Dan Davis's knowledge. When the latter returned to Portland on March 19, 1941, he found the family getting ready to leave for San Francisco that day. When he procured the will from Mr. Behrman's office, he was informed that two witnesses would be required, who must not be members of Mr. Davis's immediate family. Mr. Davis was in the living room conversing with his sister, Mrs. Anna Goldberg, when Dan and Mr. Fandrey arrived at the Davis home, bringing the will. Mr. Gordon D. Bailey, the male nurse who had been secured by Mrs. Davis to help care for her husband during that day,

was also present, but he was in the dining room, which adjoined the living room. Mrs. Davis was working in the basement. After a brief conversation between Dan and his father, the latter asked Mr. Fandrey to go with him to the "dinette", which appears to have been a small room or alcove adjoining the dining room, to witness his will. Dan supported his father by holding his arm while the party proceeded to the "dinette", and Mr. Bailey placed a chair for Mr. Davis and helped him into it. The will was lying upon the table. Mr. Davis looked at it for a time, estimated as about half a minute, then signed it, and handed the pen to one of the witnesses, who signed in turn, and handed the pen to the other, who also signed. The witnesses disagree as to which of them signed first, but that is unimportant. The will was later given by Mr. Davis to his wife, who placed it, for safe-keeping, in a small safe which was in the basement of the home. The testator signed the document in the presence of both witnesses, and they immediately thereafter signed in his presence and in the presence of each other.

Mr. Bailey testified that he heard no mention of any will and that he was given to understand, when he witnessed Mr. Davis's signature, that the instrument had reference to a sale of sacks. The trial judge believed that there had been a conversation between Mr. Davis and Dan in connection with a sack transaction, but was of the opinion that Mr. Bailey had become confused with reference to the time when such conversation took place. It is to be remembered that Mr. Bailey did not know the Davises, and spent but one day in their service, and that, during all of that day, there was confusion in the household, incident to their hurried preparations for leaving for San Francisco. Moreover, it is

quite understandable that a stranger in a household in which, as the evidence indicates, Yiddish as well as English was spoken, and in which, as stated, some confusion reigned, might have been unable to follow intelligently all of the various conversations which took place during the day. There was no reason, in fact, why he should have been. We agree with the trial judge that the witness was mistaken.

This witness testified further that, when he signed the instrument, the written portion thereof was covered either by a piece of paper or by someone's hand. This was emphatically denied by the other witness, Fandrey, and by Dan Davis. We are persuaded that Mr. Bailey was mistaken in this also.

■ The will, which is before us, consists of but one page of foolscap. The attorney who prepared it testified that it embodies the testator's instructions to him. It is very simple in form, and so arranged in paragraphs that the testator could have mastered its contents almost at a glance. He had the will before him for some little time before he signed. Having signed it, we must assume that he read it, or knew its contents. 68 C. J., Wills, section 751; *In re Bundy's Estate,* 153 Or. 234, 56 P. (2d) 313.

■ It was established that the witnesses attested the will at Mr. Davis's request. He asked Fandrey to witness it and, after having signed it himself, he handed the pen to the witness who signed first, whether it was Bailey or Fandrey. That witness, after having signed, handed the pen to the other witness. The circumstances, moreover, were such that a request to sign may be implied. *In re Demaris' Estate,* 166 Or. 36, 110 P. (2d) 571.

■ It is not necessary that the witnesses should have known either the purport or the contents of the instrument. *In re Estate of Neil,* 111 Or. 282, 226 P. 439; *In re Estate of Shaff,* 125 Or. 288, 266 P. 630.

The contestant cites *Luper v. Werts,* 19 Or. 122, 23 P. 850, in which case the will involved was declared invalid by this court because one of the witnesses did not see the testator sign, and the testator did not in any manner acknowledge to the witness that he had executed it. The circumstances here clearly differentiate that case from the case at bar. Contestant cites also, in this connection, *In re Norswing's Estate,* 47 Cal. App. (2d) 730, 118 P. (2d) 858, to the point that it is essential that each of the attesting witnesses to a will should understand that, at the time of subscribing or acknowledging it, the testator promulgated it as his will. It is sufficient to say that that decision was based upon a specific requirement of the law of California (Probate Code, section 50, subd. 3), which provides that a testator, at the time of subscribing the instrument "must declare to the attesting witnesses that it is his will." This is not the law in Oregon. *In re Estate of Neil,* supra.

There is no suggestion that any different will was surreptitiously substituted for the one which Mr. Behrman prepared as instructed, as appears to have been the case in *In re Bundy's Estate,* supra, which case is cited by the contestant. The contestant, citing *In re Coleman's Estate,* 192 Minn. 86, 255 N. W. 481, contends that the mere signing of the will by the testator is not enough. The opinion, however, does not support this contention. The court said:

"* * * The will in question may have been signed, but was not subscribed. *Signing is enough.* In re Estate of Cravens, 177 Minn. 437, 225 N. W.

398. But if there was a signature, *it was neither in the presence of the subscribing witnesses nor acknowledged as such to them.*" (Citing cases.) Italics ours.

The will under consideration here contained a formal attestation clause, reading as follows:

"The foregoing instrument was at the date hereof by the said Isaac Davis, also known as I. K. Davis, signed, sealed and published as, and declared to be, his last will and testament in the presence of us, who, at his request and in his presence and in the presence of each other, have hereunto subscribed our names as witnesses thereto:

(Sgd.) Gordon D. Bailey,
Witness.
(Sgd.) William E. Fandrey,
Witness."

From the situation of the signatures in immediate juxtaposition under this clause, we think it is improbable that the witnesses did not read it, "in order to know where and what to sign." *In re Estate of Shaff,* supra. Moreover, as the witnesses saw Mr. Davis sign, and his signature appears above the attestation clause, it is evident that the latter at least could not have been concealed from them without arousing their curiosity or suspicion, and Mr. Bailey testified that he did not, at that time, suspect any irregularity.

■■ The contestant argues that the will is invalid by reason of fraud in its execution and attestation. As to fraud in the execution, we have already passed upon that point adversely to the contestant. The witness Bailey testified that he was led to believe that the document which he was witnessing was a business contract of some sort. We have said that we believe he was mistaken in this. In addition, it is to be observed that

the attestation clause which he signed is in itself evidence. *Poindexter's Adm'r v. Alexander*, 277 Ky. 147, 125 S. W. (2d) 981. That case is cited by the contestant, and holds that the presumption of regularity of execution may be rebutted by sufficient direct evidence, and that such direct evidence may be the adverse evidence of the subscribing witnesses. In that case, however, the will contained no attestation clause. We quote from the opinion:

> "Where the evidence of an attesting witness contradicts a positive statement, plainly, the witness discredits himself and the weakness of his own testimony cannot as a matter of law overcome the prima facie case made out by the will itself. Caddell's Heirs v. Caddell's Executor, supra; Jenkins v. White, 298 Ill. 502, 131 N. E. 634. Where, however, testimony of a subscribing witness does not contradict a positive statement in the attestation clause, we can see no reason why the same weight should not be accorded to his testimony even though it is adverse to the will as to that of any other witness. * * *"

██ An attestation clause which recites due execution of the instrument creates a strong presumption in favor of due execution, and such presumption can be overcome only by "clear and convincing evidence". *Harrington v. Sax*, 138 Or. 283, 4 P. (2d) 635, 79 A. L. R. 389; *In re Mendenhall's Will*, 43 Or. 542, 72 P. 318, 73 P. 1033; *In re Estate of Shaff*, supra. This court, in *In re Lambert's Estate*, 166 Or. 529, 114 P. (2d) 125, stated as follows:

> "* * * we think that the mere attestation of the execution of a will affords only a presumption that the attesting witnesses will support its validity, if called as witnesses in a contest of such will, by testifying that at the time of its execution the testator

was of sound and disposing mind; but, when such attesting witnesses testify to the contrary, such presumption is overcome.''

The opinion does not mention whether or not the will in that case had an attestation clause. The evidence overwhelmingly showed that the testator was incompetent. The court quoted with approval from *Davis v. Davis,* 64 Colo. 62, 170 P. 208, to the effect that, when a person, who has attested as a witness the execution of a will, afterwards, upon a contest of the will, testifies in discredit of the testator's testamentary capacity, his testimony goes no further than to subject his own credibility to question. Similar testimony by an attesting witness, tending to show that the testator was persuaded to execute the will by fraudulent inducements or artifices, would be subject to the same principle. The adverse testimony of the witness Bailey, at the most, presented a question of fact for the trier of the facts—in this instance, the court. We are of the opinion that he decided the question correctly.

■ The next ground of contest is that, at the time of the execution of the will, Mr. Davis was of unsound mind, mentally incompetent, and without testamentary capacity. As to this, we are of the opinion, as was the trial judge, that the testamentary capacity of Mr. Davis was amply sustained by the proof. In November, 1940, Mr. Davis caused a copartnership to be formed, consisting of himself, his wife and his son, and transferred his business to such copartnership. No serious question is raised respecting his competency at that time and, as a matter of fact, he was then apparently in good health. His competency, during the period from December, 1940, until some time subsequent to the date when the will was executed, was attested by

business acquaintances, neighbors, relatives, his attorney and a dentist. When Mr. Davis first became ill, it appears that the condition of his health alarmed him, and that he was nervous, excitable and prone to fits of weeping. However, there is strong evidence that he kept in close touch with his business affairs, used the telephone frequently, dictated business and personal correspondence, signed his letters, signed business checks, negotiated firm loans through the bank, and signed the notes for such loans. This condition continued for some considerable time — perhaps two months—after the will was executed. During all of this period, his conversation usually was rational and coherent. After he came back from San Francisco, he visited the plant of the Davis Bag Company. Some new machinery had been installed in his absence, in which he was very much interested, and he inspected the machinery and had it explained to him. On that occasion, his speech was normal. He carried on conversations without difficulty. He talked to all of the employees and told them that, as soon as he was able to go back to business, he intended to give them a party. He thanked them for sending him flowers while he was in California. In conversing with old friends, he recalled and discussed clearly incidents that had occurred in the Old Country more than forty years before. On February 9, 1941, he attended a party which was given in celebration of the thirty-fifth wedding anniversary of two intimate friends of his. At their wedding, Mr. Davis had been "best man". There were between forty-five and fifty guests at the party, and Mr. Davis was urged to make a speech, which he did adequately, although expressing himself as being rather embarrassed at having to speak without teeth, the occasion

being subsequent to the time when his teeth were extracted. Later in the evening the guests played pinochle, in which he joined, and afterwards he indulged in another card game. He himself drove his car from his home to the place where the party was held.

Dr. George A. Cathey, a neurologist and brain surgeon who attended Mr. Davis from March 7, 1941, until he died, testified that while he was in the hospital between March 12 and 16, 1941, Mr. Davis showed marked improvement. He left the hospital on the date last mentioned, and Dr. Cathey attended him on the 17th, 18th and 19th of March, the last mentioned date being the day on which the will was executed. In Dr. Cathey's opinion, Mr. Davis's mental condition at that time was "very normal". The doctor talked with Mr. Davis "quite a bit". He was a very interesting man to talk to. They talked about general subjects other than Mr. Davis's mental and physical condition, and he was able to converse intelligently. He was able to know his wife and children, and was capable of knowing what property he owned. He discussed with the doctor what treatment he was to receive. On the 23d of April, Mr. Davis had an apoplectic seizure of some sort, following which he was in a stupor for a period of several hours. His physical condition at that time was getting worse, so he was returned to the hospital on June 12th, and an encephalogram was performed. Thereafter, until his death, his condition grew progressively worse. From about the middle of June until he died, there were periods when he did not recognize anyone. Toward the last his speech was incoherent, and he was unable to recognize even members of his own family.

For the contestant, Dr. G. W. Millett, a physician specializing in internal medicine, testified that Mr.

Davis consulted him about January 19, 1941, being brought to the doctor's office by his daughter, Mrs. Israel. He complained of being confused, said that he had put his left shoe on his right foot, and gave other indications of lack of physical control. He consulted the doctor again on January 21st and February 10th, and on the last occasion his condition was worse. Dr. Millett observed that Mr. Davis's speech was a little affected, and showed "a slight scanning", by which we presume that he meant that the patient's speech did not quite scan, and he concluded that Mr. Davis was "wrong either mentally or that he had some slight stroke". He advised him to consult Dr. D. C. Burkes, a specialist in mental and nervous diseases. Dr. Burkes was not at that time available, and it was then that Mr. Davis consulted Dr. Cathey. On the advice of Dr. Millett, Mr. Davis had his teeth extracted, three operations being necessary for that purpose, the first of which was on January 21st, the second on January 28th, and the last on February 4th, 1941. Mrs. Israel accompanied him on those occasions. The dentist testified that he did not consider Mr. Davis to be mentally competent, but said that on his last visit he showed a little improvement. Other witnesses gave testimony tending to indicate that, on occasions during the period of Mr. Davis's illness, he had a tendency to talk incoherently, and sometimes had difficulty in recognizing them. In response to a hypothetical question, Dr. Burkes testified that, in his opinion, Mr. Davis was suffering from an organic disease of the brain, and he assumed that the cause was either some brain lesion, such as a tumor, or a vascular or blood vessel disturbance. He thought that it was within the realm of possibility for such a person to know reasonably well

what he was doing, but that his judgment would not be normal. He was not acquainted with Mr. Davis.

We think that the testimony of Dr. Cathey, who was Mr. Davis's personal physician about the time when he made his will, and who attended him professionally on the very day when he executed it, is entitled to greater weight than that of Dr. Millett, the specialist in internal medicine, or that of the dentist who extracted his teeth, neither of whom attended Mr. Davis later than February 10, 1941. Dr. Cathey's testimony, moreover, no doubt weighed more heavily with the court than that of Dr. Burkes, who was not acquainted with Mr. Davis, and gave his opinion only in response to a hypothetical question. *In re Shanks' Estate,* 168 Or. 650, 126 P. (2d) 504; *Copenhefer v. Powers,* 137 Or. 145, 300 P. 505; *McGreal v. Culhane, ante* p. 337, 141 P. (2d) 828.

Mrs. Israel, the contestant, testified at great length respecting her relationship with her father, which was undoubtedly very cordial until after her husband severed his business connections with Mr. Davis, which was in February, 1941. She gave considerable testimony indicating that during the period of his indisposition, Mr. Davis was highly emotional, incoherent, depressed, subject to weeping spells, and unable to get about without some assistance. Mr. Davis was of Jewish extraction, however, and the evidence indicates that people of that race, when under stress, are more emotional than most people are.

Viewing the testimony as a whole, we are of the opinion that it preponderates strongly in favor of the mental competency of Mr. Davis at the time when he executed his will and for a period thereafter, extend-

ing to about the latter part of May, 1941. Conceding that the testimony of the subscribing witnesses is entitled to great weight *(In re Will of Robert Carr,* 121 Or. 574, 256 P. 390), it is to be observed that one of these, Mr. Fandrey, testified that the testator was competent, and even Mr. Bailey, the other witness, testified that, while it was difficult to converse with Mr. Davis, he talked rationally and coherently, although not very long on any one subject. Mr. Davis very definitely knew what his property was, and manifested an active interest in his business and its affairs. He was well aware of his family relations, and there is nothing about the will which, in our opinion, indicates that he made an unnatural disposition of his estate. All he had left to dispose of was his one-third interest in the business of the Davis Bag Company, such interest being appraised at $11,266.25. Such real property as he possessed was held by him and his wife as tenants by the entirety. While it is true that he took his son into the firm, that was but natural, in view of the fact that the young man had worked for his father since he was 15 years of age, that is to say, for about six years. Notwithstanding the facts that he was ill and in distress of body and mind, the evidence indicates that he was possessed of sufficient testamentary capacity. *In re Will of Robert Carr,* supra; *In re Knutson's Will,* 149 Or. 467, 41 P. (2d) 793.

No matter what expectations Mrs. Israel may have felt in behalf of herself and her children, it cannot be said that the fact that Mr. Davis left the bulk of his estate to his wife, who had been his faithful helpmate for some thirty-five years, indicated any lack of mental competency on his part. *Estate of Allen,* 116 Or. 467, 241 P. 996.

The last ground of contest charges that the will was executed by Mr. Davis through undue influence exercised over him by his wife and son. We feel that the only basis which tends to give any support to this charge is the fact that, after Mrs. Israel's husband severed his connections with the Davis firm (the evidence does not disclose the reason for such severance), the feeling between the two families was quite bitter. For some years the Israel family had occupied, rent-free, a house belonging to Mr. and Mrs. Davis, and Mrs. Davis, during Mr. Davis's illness, brought ejectment proceedings against them. This fact was elicited from her on cross-examination by counsel for the contestant, who, on being challenged by the witness to ask her "why she done those things", omitted to pursue the subject further. The cases cited by contestant upon this branch of the case, while correct expositions of the law relative to undue influence, are hardly in point upon the facts before us. *In re Kelly's Estate,* 150 Or. 598, 46 P. (2d) 84, was a typical "gold-digger" case, in which an old man was sought to be taken advantage of by a designing female, who was moreover, at the time, the wife of another man. *In re Rupert's Estate,* 152 Or. 649, 54 P. (2d) 274, was a case in which the testator, a man 72 years of age, ignored the natural objects of his bounty, and bequeathed the major portion of his estate to his physician, to whom he was under no obligation whatever. In the case at bar, however, the husband bequeathed most of his property to his wife. There is no evidence whatever that she influenced him in that connection, save for such influence as arises naturally from the marriage relationship.

■ It must be remembered that Mr. Davis was not, by any means, senile. He was only 56 years old when he

died, and, up to a few months prior to the execution of his will, had been healthy; active and, in many ways, an unusual and outstanding personality. We are of the opinion that the evidence fails to disclose that he was easily influenced, or that any undue influence was exerted upon him.

The decree of the circuit court is affirmed, without costs to either party.

■■ The lower court, by an order dated July 2, 1942, allowed contestant the sum of $250 as attorney's fees. Respondents have appealed from that order. A reasonable discretion over the allowance or refusal of attorney's fees in cases of this sort should rest with the probate court. In view of the facts and circumstances of this particular case; we see no sufficient reason for disturbing the court's order. It is, therefore, affirmed, without costs to either party.